[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 387 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 388 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 389 
 ON RETURN TO REMAND
Raymond Eugene Brown was convicted of four counts of capital murder for the killings of Linda LeMonte and Sheila Smoke. The appellant was sentenced to death. For a recital of the facts in this case, see Brown v. State, 571 So.2d 345 (Ala.Crim.App. 1990), writ quashed, 571 So.2d 353 (Ala. 1990).
On April 27, 1990, this Court reversed the trial court's judgment because the voir dire examination of the jury venire was insufficient to allow the trial court to make an independent determination as to whether the jurors' impartiality had been affected by the extensive publicity surrounding this case. See Brown, supra. On June 10, 1991, the United States Supreme Court vacated this Court's judgment and remanded the case to this Court for further consideration in light of Mu'Min v. Virginia, 500 U.S. 415, 111 S.Ct. 1899,114 L.Ed.2d 493 (1991). See Alabama v. Brown, 501 U.S. 1201,111 S.Ct. 2791, 115 L.Ed.2d 966 (1991). On July 26, 1991, this Court again reversed the trial court's judgment, holding that both the facts and the applicable law in this case are distinguishable from Mu'Min. See Brown v. State, 586 So.2d 991
(Ala.Crim.App. 1991). On April 10, 1992, the Alabama Supreme Court reversed this Court's judgment, concluding that trial court had "acquired adequate information from the venire to make an independent determination as to whether the jurors would be impartial" and remanded the case to this Court. SeeBrown v. State, 632 So.2d 14, 17 (Ala. 1992).
On remand, this Court on September 18, 1992, in light ofPowers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411
(1991), remanded this case to the trial court so that a hearing could be held to determine whether the prosecution could provide racially neutral reasons for the use of its peremptory strikes to remove blacks from the jury. See Brown v. State,632 So.2d 17 (Ala.Crim.App. 1992).
Pursuant to this Court's instructions, the trial court held a hearing and required the prosecutor in this case, Jimmy Evans, to give reasons for striking 20 of 23 blacks from the *Page 390 
jury venire. Following the hearing, the trial court found that the prosecutor had given racially neutral reasons for each of the State's strikes. This cause is now before this Court on return to remand.
 I
In this Court's September 18, 1992 opinion, we held that a prima facie case of purposeful discrimination had been established by the defense based on the fact that the prosecution had used 20 of its 23 strikes to remove blacks from the jury and based on the history of the Montgomery County District Attorney's Office with regard to its use of peremptory strikes to remove blacks from the juries. The State urges this Court to reexamine its finding that the appellant established a prima facie case of discrimination.
The State argues that its pattern of strikes does not provide strong evidence of discrimination. We disagree. Here, there were 24 blacks on the venire. Defense counsel struck one black and the State struck 20 of the 23 remaining blacks on the venire. Thus, the State used 87% of its strikes to remove blacks leaving a jury that was 25% black.
 "Statistical evidence may be used to establish a prima facie case of discrimination. In both Ex parte Bird, 594 So.2d 676 (Ala. 1991), and Ex parte Yelder, 630 So.2d 107 (Ala. 1992), the prosecution struck substantial numbers of black veniremembers. In Bird, the venire was 36% black. The State used 17 of its 20 (85%) peremptory strikes to remove blacks, leaving a jury that was 8% black. In Yelder, the venire was 31% black. The State used 24 of its 32 (75%) strikes to remove blacks, leaving a jury that was 16% black. With reference to both cases, the Alabama Supreme Court stated: '[T]he sheer weight of statistics such as these raises a strong inference of racial discrimination requiring clear and cogent explanations by the State in rebuttal.' Ex parte Yelder, 630 So.2d at 109."
Kidd v. State, 649 So.2d 1304 (Ala.Crim.App. 1994). See alsoEx parte Thomas, 659 So.2d 3 (Ala. 1994).
The State also argues that the fact that the State struck whites before it struck any blacks is evidence that its pattern of strikes was not discriminatory. This Court rejected this argument Freeman v. State, 651 So.2d 576 (Ala.Crim.App. 1994).
The State further argues that it is the district attorney's staff, and not the district attorney himself, that has shown a history of discrimination in the use of peremptory strikes. This Court in Freeman also rejected the State's argument that the district attorney is not responsible "for his staff's observation of or failure to observe the requirements of Batson
and Branch." Freeman, 651 So.2d at 587.
During the hearing on the Batson motion, the district attorney stated that his reasons for striking the jurors were based on a reconstruction of the notes from when the jury was struck. The district attorney stated that before he strikes a jury, the jury list is divided by the individual characteristics of the potential jurors such as "age, sex, and race." (Record on Return to Remand (R.R.R.) 21.) In this particular case, the district attorney stated that he was trying to compose a jury "tailored to what we were going to do to try to debunk the insanity defense." (R.R.R. 22.) The district attorney stated that he wished to have persons on the jury who were older, mature, married, employed, and had children.
The following are the reasons given by the district attorney for his strikes:
Juror 7 (white male — age 60) was struck because he indicated that he was opposed to the death penalty and that religion was the most important thing in his life.
Juror 145 (white female — age 44) was struck because she had been cited for traffic violations in 1987 and because her husband was a psychologist.
Juror 127 (black female — age 20) was struck because she was single, young, and had no children. Her employment status was unclear. There was a question as to whether she worked at the Gayfers department store's warehouse. The district attorney had information that she worked at the Alabama Alcoholic Beverage Control Board warehouse and several investigations had been conducted there. The district attorney *Page 391 
felt that "if she had worked at that A.B.C. warehouse, there was a possibility during the course of that investigation that she might have been interviewed and there might be some hostility to the office based on the investigation." (R. 34.)
Juror 37 (black female — age 26) was struck because she was single and had no children and because she had a minor history of traffic violations.
Juror 44 (black female — age 26) was struck because the district attorney believed she had a larceny conviction in 1987. Further, she worked at a prison and the district attorney's office was conducting an investigation of prisons at the time.
Juror 148 (black female — age unknown) was struck because she had a minor traffic violation and because she had a master's degree in psychology.
Juror 40 (black female — age 27) was struck because she was single, young, and had no children. She spoke in a loud and strong voice and the district attorney felt that she would not be easily persuaded by others.
Juror 79 (black female — age 28) was struck because she was single, relatively young, and unemployed.
Juror 46 (black female — age 33) was struck because she had been convicted of fraud.
Juror 134 (black female — age 30) was struck because she was single and had no children.
Juror 121 (black female — age 35) was struck because she was employed at Brockway Glass and the district attorney's office had conducted a major investigation of alleged embezzlement by employees. The district attorney did not feel "it was in the best interest of the State to have someone who may have been employed when there was an extensive employee embezzlement there." (R. 42.)
Juror 72 (black female — age 40) was struck because she had been convicted of fraud.
Juror 87 (black male — age 42) was struck because he had a minor traffic offense and a "child restraint violation." The district attorney did not know what the nature of that violation was and he had "no way of finding out at that particular time." (R. 43.)
Juror 117 (black male — age 22) was a college student. He was struck because he was young, unmarried, and had no children. The district attorney could not determine if he was employed.
Juror 143 (black male — age 21) was struck because he was single and had no children. He also had a traffic violation for driving on the wrong side of the road and the district attorney could not determine if that violation was the result of a plea on a charge of driving under the influence.
Juror 137 (black male — age 21) was struck because he was young and had no children and because he stated that religion was very important in his life. The district attorney also stated that he was unsure whether this potential juror would have trouble following the judge's instruction because he was a minister.
Juror 70 (black female — age 55) was struck because she was single and had no children and it was unclear whether she worked in the mental health facilities at Baptist Hospital.
Juror 2 (black female — age 48) was struck because she had a relative who had been convicted of larceny as a result of prosecution by the district attorney's office, and they lived at the same address. Furthermore, she indicated that she was a widow who did not want to be on the jury because she could not afford to take time off work.
Juror 19 (black female — age 61) was struck because her record showed a 1957 violation of the prohibition law and because she had a loud voice.
Juror 28 (black female — age 52) was struck because she indicated that religion was the most important thing in her life and because her husband was a minister.
Juror 71 (black female — age 45) was struck because she was single and the district attorney had no information on her employment status or whether she had children.
Juror 144 (white female — age 39) was struck because she was a trained labor arbitration advocate and because of her religious beliefs. *Page 392 
Juror 22 (black female — age unknown) was an alternate juror. She was struck because she had traffic violations and because she worked at Baptist Hospital.
The trial court issued the following order after the hearing:
 "Brown was convicted in this court on March 29, 1988, and sentenced to death by electrocution for the double murder of a woman and her child after having previously being convicted of murder. Both the defendant and the victims were white and this case carried no racial overtones.
 "The record in this case shows that the venire from which the jury was struck consisted of 74 persons, 9 of which (including 1 black person) were excused from service by this court, and 7 of which (including 2 black people) were struck for cause. Three black persons actually served on the trial jury in this case and one of the alternate jurors was also black. Of the state's strikes in this case 20 of 23 were black. Of the defense strikes 1 of 23 was black.
 "After hearing and fully considering the legal arguments and factual data presented in this hearing, which the record shows, the Court finds that the State through its Attorney General, Jimmy Evans, has articulated clear, cogent, and sound reasons for its peremptory strikes, all being racially neutral. In making this determination this court has specifically considered the demeanor of the sworn witness for the State, evidence at the hearing, and this court's knowledge of these proceedings as trial judge in this case.
 "In addition, this court notes for the record in this case, that in the opinion of this Court, this defendant in all respects received a fair trial in this matter.
 "In conclusion, the Court finds that the reasons stated by the State in using its peremptory strikes were/are racially neutral, and permissible under the cases of Batson v. Kentucky, 476 U.S. 79
[, 106 S.Ct. 1712, 90 L.Ed.2d 69] (1986), Ex parte Jackson, 516 So.2d 768 (Ala. 1986), Ex parte Branch, 526 So.2d 609 (Ala. 1987) and Bui v. State, [Ms. 191509, November 13, 1992] 627 So.2d 855 (Ala. 1992)."
Recently, this Court in Freeman stated,
 " 'The trial court's ruling on a Batson motion will be reversed only if clearly erroneous. Nance v. State, 598 So.2d 30, 31 (Ala.Cr.App. 1992); Jackson v. State, 594 So.2d 1289, 1294
(Ala.Cr.App. 1991). "It is well settled that the ruling of the trial court on a Batson hearing is entitled to substantial deference and will not be disturbed on review unless it is 'clearly erroneous.' " Ex parte Bankhead, 625 So.2d 1146 (Ala. 1993). In Ex parte Branch, 526 So.2d 609, 625-26 (Ala. 1987), the Alabama Supreme Court approved the use of a "clearly erroneous" [standard] for reviewing the factual findings by the trial court in Batson
proceedings. In Bui v. State, 627 So.2d 855 (Ala. 1992), the Alabama Supreme Court said, " 'the reviewing court's inquiry . . . shall not be restricted by the mutable and often overlapping boundaries inherent within a Batson-analysis framework, but, rather, shall focus solely upon the propriety of the ultimate finding of discrimination vel non.'
 Merriweather v. State, 629 So.2d 77, 88
(Ala.Cr.App. 1993). The United States Supreme Court, in Hernandez v. New York, 500 U.S. 352, 358, 111 S.Ct. 1859, 1866 [, 114 L.Ed.2d 395] (1991), explained the rationale for this standard of review, as follows:
 'Deference to trial court's findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will "largely turn on evaluation of credibility" 476 U.S., at 98, n. 21 [106 S.Ct. at 1724, n. 21]. In the typical challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lie "peculiarly within a trial judge's province." Wainwright v. Witt, *Page 393 469 U.S. 412, 428 [105 S.Ct. 844, 854] [, 83 L.Ed.2d 841] (1985), citing Patton v. Yount, 467 U.S. 1025, 1038 [104 S.Ct. 2885, 2892 [, 81 L.Ed.2d 847] (1984).' "
Freeman, 651 So.2d at 581-82.
In Bui v. State, 627 So.2d 855 (Ala. 1992), the Alabama Supreme Court held that a reviewing court must look at all of the circumstances to determine whether a trial court's conclusion that the State's reasons for its strikes are race-neutral is clearly erroneous. The Supreme Court held that, in light of the circumstances of the case, the failure of the State to offer an explanation for one peremptory strike did not mandate a finding that a Batson violation existed. The following facts were considered in Bui:
 "[T]hat Bui, who is Vietnamese, was tried for these murders before the United States Supreme Court's decision in Powers; that there was almost a five-year delay in requiring the prosecutors in this case to come forth with the reasons for striking blacks from the venire; that race-neutral reasons were given for striking eight of the nine black persons removed from the venire by the state; that this case does not involve a black defendant or a black victim; that one black person served on the jury (the prosecutors had the opportunity to strike this black person also, but did not); that the defense struck one black person from the venire; and that one of the most distinguished black circuit judges in this state was not convinced that the state's strikes were racially motivated."
Bui, 627 So.2d at 860. In this case, the appellant, who is white, was tried before the Powers decision; almost five years had passed between the time the prosecutor struck the jury and the time he proffered his reasons for his strikes; race-neutral reasons were given for most of the prosecutor's strikes; neither the defendant nor the victims in this case are black; three blacks served on the jury in this case; the defense struck one black person from the jury; the same trial judge that presided over Bui presided over this case and found that the State's strikes were not racially motivated.
In Justice Adams's concurring opinion in Bui, he stated:
 "The trial judge's determination in each case that peremptory challenges were not racially motivated is, ordinarily, entitled to considerable deference. Batson v. Kentucky, 476 U.S. 79, 98 n 21, 106 S.Ct. 1712, 1724 n. 21, 90 L.Ed.2d 69
(1986). Such a determination is one circumstance on which the State is entitled to rely on appeal. The weight to be accorded this circumstance by the reviewing court is significantly magnified if the trial judge himself shares the race of the challenged veniremembers.
 "After extensive testimony and consideration of the circumstances surrounding the State's voir dire
in this case, Judge Price, an experienced black circuit judge and former prosecutor, emphatically rejected the defendant's allegations of discrimination. In doing so, he specifically referred to his natural, preemptive 'sensitivity' to this issue.
 "Judge Price's unique experience and perspective weigh heavily in favor of the State's argument."
Bui, 627 So.2d at 860-61 (emphasis in original).
While some of prosecutor's explanations for striking some of the jurors are somewhat weak, we cannot say that Judge Price's determination that the prosecutor's strikes were not racially motivated was clearly erroneous considering the "totality of the circumstances" of this particular case in relation to those in Bui, see Ex parte McNair, 653 So.2d 353 (Ala. 1994). Judge Price expressed his sensitivity to any form of discrimination several times during the Batson hearing in this case. In light of the Supreme Court's reasoning in Bui as expressed above, great deference must be given to the trial court's finding on the issue of discriminatory intent.
 II
The appellant contends that the trial court erred by refusing to grant his motion for a change of venue based on the pretrial publicity.
As we stated in Brown v. State, 571 So.2d 345
(Ala.Crim.App. 1990), this case generated extensive pretrial publicity. The defense *Page 394 
submitted 53 exhibits relating to pretrial publicity, consisting of newspaper articles and transcripts of radio and television broadcasts that dealt with this case. The publicity surrounding this case detailed this offense, the 1960 murders of three of the appellant's relatives by the appellant when he was 14 years old, and other offenses committed by the appellant, and noted that the appellant had been paroled from prison on two occasions. The articles and broadcasts also included comments by public officials on these.
Although the change of venue issue was not explicitly addressed by the Alabama Supreme Court in Brown v. State,632 So.2d 14 (Ala. 1992), it was implicitly decided adversely to the appellant. In that case, the Supreme Court concluded that the trial court had "acquired adequate information from the venire to make an independent determination as to whether the jurors would be impartial." Thus, the trial court's determination that the appellant could receive a fair and impartial trial in Montgomery County is due to be upheld.
 III
The appellant contends the trial court erred by not asking the following questions during the voir dire examination of the jury:
 "13. Would the suggestion that the child victim was sexually abused before or after being killed cause you to have difficulty deciding this case fairly and impartially?
 "14. Would the fact that the adult victim's body was mutilated with a knife cause you to have difficulty deciding this case fairly and impartially?
 "14(a). Do you think you might possibly have difficulty looking at very unpleasant photographs and videotapes involving the crime scene and subsequent autopsies of the victims?
 "14(b). Do you think that you might have some difficulty being objective and impartial with respect to this Defendant's guilt or innocence if such evidence were presented to you?"
(R. 118.) Rule 18.4,[1] A.R.Crim.P. provides in part:
 "(c) Voir Dire Examination. The court shall permit the parties or their attorneys to conduct a reasonable examination of prospective jurors. The court also may conduct an examination of prospective jurors, and the court, in its discretion, may direct that the examination of one or more prospective jurors be separate and apart from the other prospective jurors.
 "(d) Scope of Examination. Voir dire examination of prospective jurors shall be limited to inquiries directed to basis for challenge for cause or for obtaining information enabling the parties to knowledgeably exercise their strikes."
In Stringfellow v. State, 485 So.2d 1238, 1240
(Ala.Crim.App. 1986), this Court stated:
 "It is true that, 'in the process of selecting the jury from the venire afforded, each party has the right to have questions formulated by it propounded to the jury, either by the court or by the party as the court may determine, if such questions reasonably relate under the circumstances to the question of the qualification or interest or bias on the part of prospective jurors.' Griffin v. State, 383 So.2d 873, 876
(Ala.Cr.App. 1980); see also, Alabama Power Co. v. Bonner, 459 So.2d 827 (Ala. 1984). It is equally clear, however, that the trial court has broad discretion in determining how the voir dire examination of a jury will be conducted. Robinson v. State, 430 So.2d 883 (Ala.Cr.App. 1983); Witherspoon v. State, 356 So.2d 743 (Ala.Cr.App. 1978). Where the procedure employed by the trial judge is sufficient to uncover possible prejudice or bias of a juror, the right of a party to have its questions propounded to the jury is not infringed upon. United States v. Brooks, 670 F.2d 148 (11th Cir. 1982), cert. denied, 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1339 (1982)."
(Emphasis original.)
The trial court in this case did not abuse its discrevion by refusing to allow defense *Page 395 
counsel to ask the above questions. The above questions do not relate to the qualifications, interest, or possible bias of the jurors.
The appellant also seems to argue that the refusal of the trial court to ask the jury venire the above questions violated a constitutional right.
 "The Constitution does not always entitle a defendant to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him. Ham [v. South Carolina], 409 U.S. [524] at 527-528, 93 S.Ct. [848] at 850 [35 L.Ed.2d 46 (1073)]. Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.' "
Ristaino v. Ross, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020,47 L.Ed.2d 258 (1976). We can find no authority for the proposition that the appellant was constitutionally entitled to have the court ask the above questions to the prospective jury members and find no abuse of discretion in this regard.
 IV
The appellant contends the trial court erred by refusing to bifurcate the guilt phase of the trial. Before trial, defense counsel asked the court to divide the guilt phase of the trial into two stages. He proposed that during the first stage, the prosecution could introduce evidence relevant to proving the capital offenses alleged in Count I (murder of two persons pursuant to one scheme or course of conduct) and Count IV (murder during the course of sexual abuse in the first or second degree) but could introduce evidence relevant to prove murder (not capital murder) under Counts II and III of the indictment (murder while the defendant is under a sentence of life imprisonment), i.e., the prosecution would not be allowed, at this stage, to introduce evidence relating to the murder by the appellant of members of his family in 1960. During stage two, the prosecution would be allowed to introduce evidence relevant to the aggravating circumstance alleged in Counts II and III.
The evidence needed to prove the capital offense alleged in Counts II and III necessarily entails proof of the 1960 murders of his relatives. The appellant argues that bifurcating the guilt phase would have allowed the jurors to deliberate and determine the appellant's guilt on the capital offenses alleged in Counts I and IV and the murders alleged in Counts II and III without being prejudiced by the evidence concerning the prior murders which he had committed.
In Hubbard v. State, 500 So.2d 1204 (Ala.Crim.App. 1986), we addressed a similar issue with regard to a defendant charged with murder made capital because the defendant had been convicted of murder in the 20 years preceding the crime. In that case, Hubbard alleged that the introduction of the prior conviction violated his due process rights. This Court held that "[t]he aggravating circumstance [the murder was committed by a defendant who had been convicted of murder in the 20 years preceding the crime] is a statutory element of the crime which must be alleged and proven," and that the due process clause does not require "a two-stage jury trial." Hubbard, 500 So.2d at 1215.
The reasoning of Hubbard is applicable to this case. The fact that the appellant was under a sentence of life imprisonment when he committed these murders was an element of the capital offenses that had to be alleged and proved. The fact that evidence concerning the appellant's murders of his relatives had to be shown to establish the fact that the appellant was under a life sentence at the time of the murders did not violate the appellant's due process rights. In fact, the trial court instructed the jury, both at the time the evidence was introduced and during the court's charge to the jury, not to consider the previous killings in arriving at a verdict. Seealso Nelson v. State, 511 So.2d 225 (Ala.Crim.App. 1986);Cain v. State, 562 So.2d 306 (Ala.Crim.App. 1990). We find no error here.
 V
The appellant contends that many of the prosecutor's statements during closing argument were improper. We note that the appellant did not object to most of these allegedly improper comments. Although this does not preclude our review of these issues because this is a capital case, Rule 45A, A.R.App.P., it does weigh against any claim *Page 396 
of prejudice. Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied,502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). We will address each of the remarks the appellant objects to separately.
 A "I want to call your attention to the aggravating circumstances and the mitigating circumstances and not in the thorough detail that the Chief Deputy District Attorney of the Fifteenth Judicial Circuit, Ms. Brooks, did, but I won't get into weighing that. That's really what you have to do. You have to take a look at all of the aggravating circumstances and the mitigating circumstances, you have to weigh them, in light of the law. It's not for me to stand up here and lecture you on what you've got to do, to tell you and inflict upon you my personal feeling about the death penalty. That is totally irrelevant and unimportant how I feel about it, and it's totally irrelevant how he feels about it. The law is here, and we are a system of law and not of men, and I am not here to tell you to do what I want you to do. Of course, I happen to believe one way or the other. And I am not going to lecture you with some sophisticated reading by Ramsey Clark. Everybody knows who Ramsey Clark was and who he is and all about him. And whether you like him or love him, what he thinks doesn't count. It's what that judge tells you that counts because he is the living symbol of the law in the State of Alabama."
(R.R.R. 55-57.) The appellant contends that the emphasized comment above by the prosecutor implied to the jury that the prosecutor believed in the death penalty. In his closing argument, defense counsel read to the jury a quote from Ramsey Clark, former Attorney General of the United States. The relevant portion of the record is as follows:
 " 'We are here to serve the needs of society. We are not here for the sake of killing, and we are not here for the sake of vengeance. Our emotions cry for vengeance in the wake of a terrible crime, but we know that killing the criminal cannot undo the crime, it does not help the victim, it destroys human life, and brutalizes human society. If we are to still violence, we must cherish life.' Now, I didn't say that. It's not a quote from me. I can't claim it. It came from a man named Ramsey Clark, who used to be the Attorney General of the United States, the highest prosecutor in the land. And that's how he felt about the subject."
(R.R.R. 53-54.)
Even if the prosecutor's comment could be construed to be a subtle expression of the prosecutor's belief in the death penalty, his comments were a reply in kind to defense counsel's argument concerning Ramsey Clark's feelings about the death penalty. "[A] prosecutor has the right to fairly 'reply in kind' to statements made by defense counsel in the defense's closing argument." Davis v. State, 494 So.2d 851
(Ala.Crim.App. 1986). Ex parte Musgrove, 638 So.2d 1360 (Ala. 1993). When the prosecutor's comments are read in the context of defense counsel's closing argument, the prosecutor's statement was not an expression of his belief in the death penalty but a reply in kind to argument made by defense counsel. The prosecutor was pointing out to the jury that personal opinions concerning the death penalty, including his own, were irrelevant to its deliberations. The prosecutor's comments do not constitute plain error.
 B "And as I was sitting there gathering up my emotions for what I have to do here, and I don't do this with some professional varnish. Yeah, I have been here 16, 17 years. And it's not an easy job. You don't have an easy job, and the judge doesn't have an easy job."
(R.R.R. 60.) The appellant contends that these statements made by the prosecutor were improper because they "assure the jurors that someone with greater experience has already made the decision that the law imposes upon them" and "invite the jury to rely on the prosecutor's office's conclusion that the Defendant is deserving of death rather than to make its own evaluation of the *Page 397 
enormity of the Defendant's crime." Appellant's brief, p. 34. This Court does not interpret the above statements the way the appellant does, if these excerpts are viewed in context with the rest of the prosecutor's argument. Immediately before these comments, the prosecutor stated:
 "You know, today, I saw something that made me feel good in this trial. Not much did. I was touched almost to tears about it, but it made me feel good because I was taught from my birth about it, and I saw an example of it. When this poor lady came here, the mother of the defendant and got on this stand. Here is a man that killed his mother's mother, his mother's grandmother, and his mother's sister, and such is the love of a mother for her child that she got up on the stand and wept for him. Now, you think about that. I have never seen such an example of that universal truth before."
(R.R.R. 59-60.) Obviously, the prosecutor was making the point to the jury that he had heard a very emotional appeal from the appellant's mother asking for the appellant's life and that it was not easy for him to ask for the death penalty. There is no error here. Further, we note that the appellant failed to object to these remarks.
 C
The appellant contends that prosecutor's statement that the jury's verdict was advisory violated Caldwell v. Mississippi,472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
 " 'The comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was "advisory" and a "recommendation" and that the trial court would make the a final decision as to sentence does not violate Caldwell.' Kuenzel at 502 (quoting Martin v. State, 548 So.2d 488, 494
(Ala.Crim.App. 1988), aff'd, 548 So.2d 496 (Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989)). See also Smith v. State, 581 So.2d 497 (Ala.Crim.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala. 1991)."
Johnson v. State, 620 So.2d 679, 706 (Ala.Crim.App. 1992). The prosecutor's comments were as follows:
 "You don't have an easy job, and the judge doesn't have an easy job. Your verdict is advisory, and he's asked you to presume it's final in your deliberations. The reason he's done that is because what you say is important. It is very, very important."
(R.R.R. 60.) Clearly, "the prosecutor's comment accurately informed the jury of its sentencing authority and in no way minimized the jury's role and responsibility in sentencing."Johnson, 620 So.2d at 706. Further, we note that the appellant failed to object to the prosecutor's remark.
 D "I thought about, as I gathered my emotions, that Linda Lemonte was a mother and died, more than likely, protecting her child, giving her life for her child. Don't you know that he wanted that child and he had to kill Linda LeMonte to get her? As long as she lived, she would never permit the sort of torture and mutilation of that child. In order to have that child, he had to kill her. And she wasn't up on the stand crying for the defendant. She was laying down her life for her child. Don't you know that's what happened? So, Sheila Smoke had a loving and caring family. No greater love can be given for a human than to give his life for his friend. No greater love to have a mother lay down her life for her child."
(R.R.R. 61.) The appellant contends that this argument was unsupported by the evidence. These remarks were a reply to defense counsel's argument that the jury should consider as a mitigating circumstance the fact that the appellant had a loving and caring family.
The bodies of Linda LeMonte and Sheila Smoke were found in two different rooms. Dr. Allan Stillwell, who performed the autopsies, testified that he believed time had elapsed between the time Linda LeMonte's throat was cut and the time her body was mutilated. Dr. Stillwell testified that the appellant could have slit LeMonte's throat, then gone into Sheila's room where he sexually *Page 398 
abused and then killed her, and then returned to the living room, where he mutilated LeMonte's body.
" 'A prosecutor may state or comment on proper inferences from the evidence and may draw conclusions from the evidence, based upon his own reasoning. Sasser v. State, 494 So.2d 857
(Ala.Cr.App. 1986).' Bui v. State, 551 So.2d 1094, 1109
(Ala.Cr.App. 1988), affirmed, 551 So.2d 1125 (Ala. 1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712
(1991)." Hunt v. State, 659 So.2d 933 (Ala.Crim.App. 1994). The prosecutor's comments quoted above were legitimate inferences from the evidence. Certainly, the prosecutor could conclude and argue that no mother would allow her child to be sexually abused, killed, and mutilated without putting up a fight. Further, we note that there was no objection to this testimony.
 E "The defendant is not liable to escape. My God, do you think he has to escape? Think about this for a minute? Do you really think he has to escape? Now, I'm not saying this because I want you to punish him for killing his grandmother, his mother's [grand] mother, and his family. Listen, we are not here about punishing him for that. There was a punishment attempt for that. I want you to think about this. His lawyer says that in 1961 he went in, he was paroled around 1973. Think about that. Three people murdered. Four years a piece. 61 from 73, I believe, is 12. Four years per murder. Huh. Is that the punishment? No, sir, he doesn't have to escape. He's got people tripping over themselves to get him out. . . . Does he have to escape when he's got people like that falling all over backwards to get him out?"
(R.R.R. 62-65.) The appellant contends that the prosecutor's argument implied that "the Appellant would find or have some way to get out if given life without parole." The argument was in response to defense counsel's assertion that the appellant was not an escape risk. When defense counsel objected to the prosecutor's remarks, he asked the trial court to instruct the jury that "life without parole is life without parole." (R.R.R. 65.) The trial court ruled that such an instruction was unnecessary. The prosecutor then continued:
 "Folks, I want you to know that life without parole is life without parole. Okay. Y'all just believe that with all of your heart. Don't let anything I say to you tell you that or suggest to you in a various way that life without parole is not anything else but life without parole. Okay? Let's get that straight."
(R.R.R. 65-66.) We fail to see how the appellant was harmed in this instance. When defense counsel objected to the argument, he asked that the jury be informed that life imprisonment without parole meant life without parole. The prosecutor then told the jury exactly what defense counsel wanted the jury to be told. There is no error here.
 F
Immediately following the above quoted argument, the prosecutor continued:
 "And I said all of that in order to say this: Folks, what is life without the possibility of parole? It's being locked up forever in the penitentiary. Now we are talking about punishment here, aren't we? Hasn't he already gotten that as a practical matter? Do you think that the parole board would ever parole him if he had never been charged here with all of this, that the parole board would ever parole him again after all of that? No, sir. He got that as a practical matter. We are here to punish him for killing Sheila Smoke and Linda LeMonte. As a practical matter, he's already gotten it."
(R.R.R. 66-67.) The appellant contends that the prosecutor's comments "[misled] the jury by making [it] think that life without parole would be a superfluous punishment without meaning because the Appellant would never be paroled again anyway." (Appellant's brief, p. 36.) We note that the appellant did not object to these remarks. The prosecutor was merely arguing that the jury should give the appellant more than the sentence he would already, in effect, be serving. This is an argument for retribution and arguments *Page 399 
for retribution are proper during a capital case.Kuenzel.
 G "And when I look for mercy for my misgivings, I am constantly reminded the truth is always interwoven with mercy. You can't come in, when I was little, to my mama's house and lie to her and expect to get mercy. Boy, let me tell you. You'd get it for what you did wrong, and then you'd get it for lying, and you wouldn't get no mercy. So, we get up on this stand and we conceal for 27 years what we really knew about what we did in 1960."
(R.R.R. 73.) The appellant argues that these arguments were an improper comment on the appellant's failure to testify at his trial for the 1960 murders. At trial, defense counsel did object to the above comments but, he objected on the basis that the comments were untrue characterizations of the evidence. Although usually a specific objection waives all other grounds of objection, we must review the prosecutor's remarks for plain error. Rule 45A, A.R.App.P. Henderson v. State, 583 So.2d 276
(Ala.Crim.App. 1990), aff'd, 583 So.2d 305 (Ala. 1991), cert.denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
Even if the prosecutor's comments could be construed as a comment on the appellant's failure to testify during his trial for the 1960 murders, which is questionable, any error would be harmless error because the appellant testified during the sentencing hearing that he did not testify during this trial and that he had never testified in any previous court proceeding.
 H "Remember that other statement? 'Get me a lawyer. Get me a lawyer. Okay. Get me a lawyer. Then, if you won't use it against me, I'll talk to you. Okay.' Is that a little tick? Is that somebody suffering from extreme emotional duress?"
The appellant argues that the prosecutor's comment regarding "that other statement" was a reference to a statement the appellant made to the police, which the trial court suppressed before trial. While it does appear that the prosecutor's comments are a reference to the statement suppressed by the trial court, the prosecutor did not err by referring to the statement. Dr. John W. Davis, an expert witness for the defense, stated that he had relied on this statement as a basis for his opinion that the appellant was insane at the time of the murders and this statement was later admitted into evidence. Further, during the cross-examination of Dr. Claude M. Brown, another of the appellant's expert witnesses, the following occurred without objection:
 "Q. [the prosecutor]: In fact, sir, the statement that he gave to the police was only after an agreement that they wouldn't use it against him, wasn't it?
"A. I don't recall, it could have been.
 "Q. Could have been? You read the report, didn't you?
"A. Yes.
"Q. You not aware of that?
 "A. I don't remember it word for word, but it could have been.
"Q. Would it make a difference to you?
"A. Possibly so.
 "Q. Well, I am telling you now that that's what happened, does it make a difference to you?
"A. No.
 "Q. So, it doesn't make any difference to you that he was rational enough to say 'I ain't going to make any statement, I want a lawyer,' and then they said, 'Well, let us just talk to you and you tell us all about it', and they agreed that it won't be used against him. That's pretty rational, isn't it?"
(R.R.R. 829-30.) Thus, the substance of the prosecutor's statements was already known by the jury; the prosecutor was merely commenting on the evidence.
 I "And then lastly, the last thing they did is close with a general appeal to make you feel bad and worry about giving this defendant an advisory verdict to the court." *Page 400 
(R.R.R. 75.) The appellant argues that this remark violatesCaldwell v. Mississippi. We have addressed this issue in Part V-C of this opinion.
 J "I'm just a human being with what I believe to be a calling, and a gift from God, and that's the ability to talk common sense. The law degree I got ain't worth a hill of beans. It's a letter of appointment. That's all it is. And I know what I do has to be done. Somebody has to do it. And I don't make any bones about it, but I don't enjoy it. And somebody has to sit on juries, and somebody has to do what has to be done. I gave an oath to the constitution, you gave an oath to the constitution, the judge gave an oath to the constitution. And all of the publicity in the world can't make you break your oath, and I know that. It can't make me break mine. Judge Price never has broken his."
(R.R.R. 79-80.) The appellant argues that these remarks constituted an appeal to the religious beliefs of the jurors asking them to trust the judgment of the prosecutor. There was no objection to this argument.
When this portion of the closing argument is read in context with the entire argument, it is clear that the prosecutor was informing the jury that he did not like to ask for the death penalty but that he believed that it was his duty to seek the death penalty in certain instances under the laws of the State of Alabama. The reference to "a gift from God" referred to his alleged abilities as a prosecutor. Any possible error that may have occurred in this line of argument certainly could not have adversely affected any substantial right of the appellant. Rule 45A, A.R.App.P.
 VI A
The appellant contends the trial court erred in its instruction to the jury regarding reasonable doubt and aggravating circumstances. He contends that the trial court's instructions could have led the jury to believe that the mitigating circumstances had to outweigh the aggravating circumstances beyond a reasonable doubt to justify a sentence of life imprisonment without parole. The portion of the trial court's charge to which the appellant objected is quoted below:
 "THE COURT: Thank you. The court will now define reasonable doubt for you as the law defines it. The law says the doubt which would justify — a doubt which would — is the standard during this phase of the trial is a doubt, is a substantial doubt. A reasonable doubt is not a — is a reasonable doubt or a substantial doubt, and it must be an actual and substantial doubt, not just a mere possible doubt. A reasonable doubt is not a mere guess or surmise and it is not a capricious doubt. After considering all of the evidence in the case, if you have an abiding conviction that the aggravating circumstances outweigh the mitigating circumstances, then of course, your verdict should be the one [of] death by electrocution. On the other hand, if you find that the mitigating circumstances outweigh the aggravating circumstances, then of course, your verdict should be the one of life in the penitentiary without parole. Evidence which merely gives rise to a surmise, conjecture or suspicion of what you are talking about, in balancing the aggravating and mitigating circumstances, is not sufficient in order to reach your decision on. Also, the reasonable doubt which you would use is not a mere fanciful, vague, or speculative doubt, but a reasonably substantial doubt arising from the evidence and remaining after a careful consideration of the testimony such as reasonable, fair minded, conscientious men and women would entertain under all of the circumstances. You will observe, ladies and gentlemen of the jury, that the state is not required in presenting the aggravating circumstances to convince you that the aggravating circumstances outweigh the mitigating circumstances beyond all doubt but simply beyond a reasonable doubt. Beyond a reasonable doubt means beyond a doubt for which a real and substantial reason may be given. That is the way the law defines reasonable doubt." *Page 401 
(R.R.R. 96.) We do not believe that this portion of the court's charge would lead the jury to believe that it had to find that the mitigating circumstances outweighed the aggravating circumstances beyond a reasonable doubt before it could recommend a sentence of life imprisonment without parole. However, the emphasized portion of the charge is an incorrect statement of the law. The state is required to prove beyond a reasonable doubt the existence of aggravating circumstances, but the State is not required to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. Hart v. State, 612 So.2d 520
(Ala.Crim.App. 1992), aff'd, 612 So.2d 536 (Ala. 1992); cert.denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993);Williams v. State, 601 So.2d 1062 (Ala.Crim.App. 1991);Rutledge v. State, 523 So.2d 1087 (Ala.Crim.App. 1987), rev'don other grounds, 523 So.2d 1118 (Ala. 1988). The appellant, however, was not harmed by the court's erroneous statement because it had the effect of increasing the State's burden of proof in presenting the aggravating and mitigating circumstances. This standard would make it more difficult on the State to prove that the aggravating circumstances outweigh the mitigating circumstances and, therefore, less likely that the jury would recommend death.
Furthermore, the trial court corrected this erroneous statement later in the jury charge and informed the jury that the existence of aggravating circumstances had to be established beyond a reasonable doubt before those circumstances could be considered and that death would be the proper verdict if they jury found that the aggravating circumstances outweighed the mitigating circumstances (R.R.R. 115, 117-19.) The trial court also correctly told the jury that if the mitigating circumstances outweighed the aggravating circumstances or if no aggravating circumstances had been established, then the verdict should be life imprisonment without parole. (R.R.R. 115-16, 120.)
 B
During the court's charge to the jury in the sentencing phase of the trial, the following occurred:
 "In making your recommendation concerning what the punishment should be, you must determine whether any aggravating circumstance exists. And if so, you must determine whether any mitigating circumstance or circumstances exist. In making your determination concerning the existence of aggravating and mitigating circumstances, you should consider the evidence presented at this sentence hearing. You should also consider any evidence that was presented during the guilt phase of the trial that is relevant to the existence of any aggravating or mitigating circumstance."
(R.R.R. 98-99) (emphasis added). The appellant contends that the trial court erred by using the word "should" instead of "must" in the court's charge. A similar argument was made inSmith v. State, 581 So.2d 497, 51213 (Ala.Crim.App. 1990),rev'd on other grounds, 581 So.2d 531 (Ala. 1991). In that case, the appellant argued that "the trial judge committed reversible error by extending an invitation to the jury during the penalty phase of the trial to consider guilt-phase evidence." This Court stated:
 "The same jury that returned a verdict against the appellant also sat through the penalty-phase evidence, argument, and instructions, and returned a recommendation of death. It would be unrealistic for us to suppose that jurors, such as these, could sit through a lengthy trial, return a verdict, and then immediately go into a sentencing hearing and magically forget all they heard during the guilt-phase of the trial. Therefore, it seems to us that the trial judge's instructions benefitted the appellant, since the trial judge asked [the jury] to consider only that evidence from the guilt phase of the trial which applied to aggravating and mitigating circumstances. This becomes especially so, when, as here, the trial judge fully explains the purpose of mitigating and aggravating circumstances, explains the weighing process, and lists the applicable circumstances as included in §§ 13A-5-49 and -51, Code of Alabama 1975 (Supp. 1989)."
The reasoning in Smith is certainly applicable to this case. *Page 402 
A review of the court's entire charge to the jury in this case reveals that the trial court's charge clearly informed the jury that it was to consider all evidence in determining the existence or nonexistence of aggravating and mitigating circumstances. Therefore, no error occurred here. Carroll v.State, 599 So.2d 1253 (Ala.Crim.App. 1992), aff'd,627 So.2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207,127 L.Ed.2d 554 (1994).
 C
The appellant contends the trial court erred when it gave the following instruction during its oral charge:
 "If you find beyond a reasonable doubt that the three aggravating circumstances upon which I have instructed you does exist in this case, then you must proceed to consider and determine the mitigating circumstances."
(R.R.R. 106.) The appellant alleges that this statement could lead the jury to infer that it could not consider any evidence in mitigation unless it found the existence of all three aggravating circumstances. A review of the court's entire charge reveals that the trial court thoroughly and correctly instructed the jury on the law regarding mitigating evidence. The trial court told the jury that it was to consider mitigating evidence if it found the existence of aggravating circumstances. We find no error here.
 D
The appellant contends that the court's charge implied that the jury's findings concerning mitigating circumstances had to be unanimous. We have reviewed the trial court's charge and conclude that the charge was not contrary to the principles set out in Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860,100 L.Ed.2d 384 (1988). See Ex parte Martin, 548 So.2d 496 (Ala. 1989); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990),aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Dill v. State, 600 So.2d 343
(Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992),cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684
(1993).
 E
The appellant contends that the trial court erred when it gave the following instruction:
 "I will now read to you a list of some of the mitigating circumstances that you may consider. These include:. . . . Two, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was substantially impaired. A person's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is not the same as his ability to know right from wrong, generally, or to know what he is doing at a given time, or to know what he is doing is wrong. A person may indeed know that doing the act that constitutes a capital offense is wrong and still not appreciate its wrongfulness because he does not fully comprehend or is not fully sensible to what he is doing or how wrong it is. Further, for this mitigating circumstance to exist, the defendant's capacity to appreciate does not have to have been totally obliterated. It was enough that it was substantially lessened or substantially diminished. Finally, this mitigating circumstance would exist even if the defendant did appreciate the criminality of his conduct, if his capacity to conform to the law was substantially impaired since a person may appreciate that his actions are wrong and still lack the capacity to refrain from doing them."
(R.R.R. 106-08.) The appellant contends that this charge implies to the jury that it could not consider evidence of mental illness or impairment unless that fact contributed to the crime. This contention is without merit. The above-quoted charge relates to the evidence of mitigating circumstance enumerated in § 13A-5-51(6), Code of Alabama 1975. It did not imply that the jury was precluded from considering any evidence of mental illness or mental impairment. Further, the trial court also stated in its charge:
 "A mitigating circumstance does not have to be included in the list I have read to you in order for it to be considered by you. In addition to the mitigating circumstances previously specified, mitigating circumstances *Page 403 
shall include any aspect of a defendant's character or record, and any other circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment with parole instead of death. A mitigating circumstance considered by you should be based on the evidence you have heard."
Clearly, the jury was instructed that it could consider any evidence in mitigation; the trial court's instruction did not in any way imply that the jury could not consider certain mitigating circumstances.
The appellant also contends that the trial erroneously refused to give his requested charge no. 13, which consisted of 14 points that he believed the jury should consider as mitigating circumstances. This Court has held that the trial court does not have to instruct the jury from a list of specific non-statutory mitigating circumstances provided by the defendant. Cochran v. State, 500 So.2d 1161 (Ala.Crim.App. 1984), aff'd in part, rev'd in part, 500 So.2d 1179 (Ala. 1985).
 VII
Before trial, defense counsel requested funds to hire experts to assist the defense in preparing the appellant's insanity defense. This request was approved and Claude M. Brown, M.D., and John W. Davis, Ph.D., were retained by the defense.
The State filed a motion for discovery, which requested that the State be permitted to
 "1. . . . analyze, inspect, and copy or photograph all books, papers, documents, photographs, tangible objects, buildings, or places, or portions thereof, which are within the possession, custody or control of the Defendant and which the Defendant intends to introduce in evidence at the trial.
 "2. . . . inspect and copy all results and reports of all physical and mental examinations and all scientific tests and experiments made in connection with the case, which are within the possession or control of the Defendant and which the Defendant intends to introduce in evidence at the trial or which were reported by a witness whom the Defendant intends to call at the trial, if the results or reports related to the witness' testimony."
(C.R. 71.) The trial court granted the State's motion, and the defense provided the State with copies of the reports of Dr. Brown and Dr. Davis. Included with the reports was a list of documents the experts had relied on in arriving at their conclusions and in formulating their opinions. Dr. Davis's list included
 "1. Presentence investigation, re: 1960 murders, which includes a 'statement' of the defendant.
"2. Bryce records of 1960.
"3. Prison psychological tests.
"4. Memo, re: prison psychological evaluation.
 "5. Narrative by Brown written at Charles Hollifield's [defense counsel] request relating everything about Linda LeMonte. . . .
 "6. Postmortem on Linda LeMonte (mother of Sheila Smoke).
"7. Postmortem on Sheila Smoke.
"8. Bryce records of 1987.
 "9. Narrative by Brown written at Charles Hollifield's request relating his early history up to age of 1960 murders (The facts related in the narrative seem to be precisely accurate.)
 "10. Portion of police report which contains a statement pertaining to present murder [committed by] Brown. (Although the statement seem to be a confession, he has yet to make incriminating statements at any other time. He does not deny these murders; he states that he does not recall what happened. The narrative, re: taking of picture of murders, was only recently related. Previously he had professed a memory gap until following morning.)
 "11. Social history by Phyliss Lowery, social worker.
 "12. Computerized MMPI [Minnesota Multiphasic Personality Inventory] report generated by the computer service at the University of Alabama Psychology Dept.
 "13. Consultation with Dr. Claude Brown and Charles Hollifield on March 8, 1988." *Page 404 
The trial of this case began on Wednesday, March 23, 1988. On Thursday, March 24, 1988, during the presentation of the State's case, the following discussion occurred outside the presence of the jury.
 "BY MR. EVANS: We anticipate that they will call the psychiatrist, Dr. Brown, and some clinical psychologist to rebut, to carry their burden on the insanity. We have asked for, and have not received — I'm not blaming anybody for anything, I am just saying we don't have them, but certain things would be needed for cross-examination. We have here a report, — we, actually, the State, the State would like to have the Wechsler Intelligence, the WISC-R test, the actual test, the score sheets, all this information. We would also like to have the Wide Range Achievement Test, The Rorschach test — we are talking about the actual Rorschach, the cards that were used and distributed to the defendant, the actual ones that were used — all the paraphanalia, regalia, notes, everything totally used by the psychiatrist in order to cross-examine him and we don't have it.
 "BY THE COURT: Okay I issued an order, ordering both sides to exchange documents and make available to each other what you plan to use in the case, okay?
"BY MR. EVANS: Yes, sir.
 "BY THE COURT: That's what I expect you to do. You have given the defense everything you have planned to use and the defense is to give you everything they plan to use.
"BY MR. EVANS: Where these tests are concerned?
"BY THE COURT: Well, that includes everything.
 "BY MR. EVANS: I would like him to bring all that stuff with him.
 "BY MR. BLANCHARD: He will have with him whatever documents he needs to support his opinion, Your Honor. He has — not everything he has given to us we have given to Mr. Evans, I'll say that.
"BY THE COURT: I understand that.
 "BY MR. BLANCHARD: Furthermore, Judge, under Rule 18.2(c) [now Rule 16.2(c), A.R.Crim.P.], reports of examinations and tests in the discovery rules, don't require us to turn over the materials that, — the doctors' work products. It requires us to turn over his report, which we have done. We have done what we are supposed to do under the rules.
 "BY THE COURT: I'm not saying you have not, I am just saying whatever the rules require and whatever the order says —.
 "BY MR. EVANS: Judge, he is going to use his so-called Rorschach test, and all these cards up here to talk about conclusions he drew from them. Now, we are not talking about adding two and two is four, we are talking about making a speculative conclusion.
 "BY THE COURT: You have a right to cross-examine him.
 "BY MR. EVANS: Right, from physical documents that he used. We want those Rorschach test cards in here, we want all the test. I want to be able to go over each question answered on the test. I want to go into his abilities to knowledgeably score on those tests and what methods he used to score them, because there are four or five different methods of scores on the MMPI.
 "BY THE COURT: Have you all complied with my orders, Mr. Blanchard?
 "BY MR. BLANCHARD: Yes, I believe you entered that order and I believe we have complied with it.
 "BY THE COURT: Now, you have a right to cross-examine, and an opportunity to cross-examine him on those.
 "BY MR. EVANS: If he doesn't have those documents with him, Judge, I can't fully cross-examine this witness. What I am asking the court to do is make sure that psychiatrist knows when he comes to bring those documents with him, because I intend to cross-examine him at length as to his method of scoring on those tests, as to the conclusion he drew from each card and each test. It's going to be very long and laborious, which the State cannot conduct if he gives us some little sheet of paper.
 "BY THE COURT: Well, it's not going to be long, go get your subpoena. Mr. Blanchard, do you want to contact your *Page 405 
psychiatrist? I can have the subpoena dispatched tonight before he gets up here.
 "BY MR. BLANCHARD: Judge, he is going to bring it with him.
 "BY THE COURT: Well, now, if you tell me he is going to bring it with him, that's fine.
 "BY MR. BLANCHARD: I thought he was asking me to turn it over to him now, and I don't have it.
 "BY MR. EVANS: No, sir, I want it clear that when he gets up here, that he is going over the very cards that he showed to this defendant when he administered the Rorschach.
 "BY THE COURT: Wait a minute, wait a minute. Mr. Blanchard, you assure the court, you represent to the court that he would have everything he used in conducting all these tests?
"BY MR. BLANCHARD: Yes, sir."
(R. 350-55.)
On the same day that the above discussion took place, the chief deputy of the Montgomery County District Attorney's office issued district attorney's subpoenas to Dr. Brown and Dr. Davis. These summons commanded the doctors as follows:
 "Personally to be and appear before the District Attorney of the said county at the time you appear before the Circuit Court of Montgomery in State v. Raymond Eugene Brown, Case No. 87-1464, on or about March 25, 1988 . . . and to bring and produce at the time and place aforesaid, to be used as evidence, the following: Any and all original documents, notes, audiotape recordings, videotape recordings, test results, testing documents, narrative reports, memoranda, hospital records, medical records, medical reports, histories, Rorschach cards, psychological reports concerning and relating to Raymond Eugene Brown, including, but not limited to, all items listed and referred to in the attached document which is hereby incorporated herein and made a part hereof.[2]"
On Friday morning, it appears that an investigator from the district attorney's office went to Dr. Brown's and Dr. Davis's offices and told them that they were to come to Montgomery with the investigator or, in the alternative, that they could give the investigator all of their records of this case. Both experts turned over their files to the investigator.
When court convened on Monday, defense counsel made a motion for a mistrial. Defense counsel contended that the subpoenas were illegal and that they constituted improper discovery.
The authority of a district attorney to issue subpoenas is found in § 12-17-184(18), Code of Alabama 1975, which provides:
 "It is the duty of every district attorney and assistant district attorney, within the circuit, county or other territory for which he is elected or appointed:
". . .
 "(18) To, at any time the grand jury is not in session, issue subpoenas to persons to come before them, and they shall have power to administer oaths to said persons and examine them as to any violation of the criminal laws of the state."
Also, Rule 17.1(c)(2), A.R.Crim.P. provides:
 "At any time the grand jury is not in session, the district attorney shall issue subpoenas for any witnesses the district attorney may require to come before the district attorney for examination under oath administered by the district attorney as to any violations of the laws of the State of Alabama; if the matter being investigated is not before the grand jury, the district attorney shall have authority to issue such subpoenas when the grand jury is in session."
See also Ex parte Clark, 630 So.2d 493, 499-500
(Ala.Crim.App. 1993). It does not appear that the district attorney had the power to issue the subpoena in this case under either §12-17-184(18) or under Rule 17.1, because neither expert who was subpoenaed was being summoned to come before the district *Page 406 
attorney for examination. Compare Ala. Code, § 12-21-245 ("The district attorney also has authority to issue subpoenas for witnesses on the part of the state, to appear either before the grand jury or before any court in his circuit") (emphasis added).
Rule 17.3, A.R.Crim.P., provides in part:
 "(a) Production of Books, Papers, Etc. A subpoena may command the person to whom it is directed to produce the books, papers, documents, or other objects which may be designated therein.
 "(b) Production Prior to Trial and for Inspection. The court may direct that books, papers, documents, or other objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence. Upon their production, the court may permit the parties and their attorneys to inspect them, or portions thereof."
Clearly, the district attorney cannot legitimize the use of the subpoenas duces tecum under this rule either. "Rule 17.3(b) provides that the court can order that books, papers, documents, or other things designated in a subpoena be produced 'prior to trial' or 'prior to the time when they are to be offered into evidence' to allow the parties or their attorneys to inspect them." H. Maddox, Alabama Criminal Procedure, § 17.3, p. 511 (1992) (emphasis supplied). The Commentary to Rule 17.3 notes that it "is not intended to be a discovery device because Rule 16 provides for discovery. This rule it to be used to inspect evidence held by witnesses and to require its production at trial or prior to trial." While the State may have been attempting to make sure that all of the evidence relied on by the experts would be available at trial and merely wanted to inspect the materials before trial in an effort to save time during the trial,[3] the district attorney should have used the proper procedure to secure the production of this evidence by the experts.
In Sale v. State, 570 So.2d 862, 863-64 (Ala.Crim.App. 1990), Judge Bowen quotes United States v. Nixon, 418 U.S. 683,698-99, 702, 94 S.Ct. 3090, 3103-04, 41 L.Ed.2d 1039 (1974), which in turn cites Bowman Dairy Co. v. United States,341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951) as the leading case on the use of the subpoena duces tecum as a method of discovery.Bowman Dairy Co. recognized
 " 'certain fundamental characteristics of the subpoena duces tecum in criminal cases: (1) it was not intended to provide a means of discovery for criminal cases, [Bowman Dairy Co.], at 220, 71 S.Ct. 675 [at 679]; (2) its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials, ibid. . . . [I]n order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (3) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."
" '. . . .
 " 'Enforcement of a pretrial subpoena duces tecum
must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues.' "
(Footnotes omitted.) (Emphasis in original.)
Judge Bowen went on to note that the discovery rules set out in the Alabama Rules of Criminal Procedure "would be meaningless" if a party could use the subpoena duces tecum to circumvent the limitations of discovery. Although we do not approve of the method used to obtain the documents from Drs. Davis and Brown, we do not believe that this case is due to be be reversed on this ground merely because the State was *Page 407 
able to inspect these documents a few days before they were entitled to examine these documents. Clearly, the State would have been allowed to examine the documents when the experts stated that they had relied on these items in formulating their opinions with regard to the appellant's sanity.
The appellant also contends that the State should not have been allowed to examine the narratives made by the appellant. The appellant contends that the narratives were protected by the attorney-client privilege because, he says, they were made at the request of one of the appellant's attorneys. Actually, these narratives, if protected by any privilege, were protected by the psychotherapist-patient privilege, as provided in §34-26-2, Code of Alabama 1975, because they were made by the appellant with the intention of furnishing them to his expert psychologist and psychiatrist. However, the appellant waived the privilege when he raised the insanity defense. "[T]he psychotherapist-patient privilege is unavailable in a criminal trial where the defendant raises the defense of insanity. Freev. State, 455 So.2d 137 (Ala.Crim.App. 1984); Magwood v.State, 426 So.2d 918 (Ala.Crim.App. 1982), aff'd,426 So.2d 929 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097,77 L.Ed.2d 1355 (1983)." Ex parte United Service Stations, Inc.,628 So.2d 501 (Ala. 1993). See also C. Gamble, McElroy'sAlabama Evidence, § 414.01 (4th ed. 1991).
The appellant also contends that State should not have been able to examine most of the items furnished to the State by the experts pursuant to the subpoena because these items should be considered the work-product of the experts. We need not determine whether these items should be considered "the work product" because the State certainly had a right to examine these items when Dr. Davis and Dr. Brown testified that they had considered all of the documents they gave the State in forming their opinions as to the appellant's sanity. Therefore, the State would have been entitled to examine these documents.
 VIII
The appellant contends that the trial court erred by charging the jury on the aggravating circumstance that the capital offenses were especially heinous, atrocious, and cruel as compared to other capital offenses and by finding that the capital murders were especially heinous, atrocious and cruel. He contends the trial court's finding with regard to this aggravating circumstance violates Maynard v. Cartwright,486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).
 "[T]his argument has been determined adversely to the appellant in Bui v. State, 551 So.2d 1094
(Ala.Cr.App. 1988), affirmed, Ex parte Bui, 551 So.2d 1125 (Ala. 1989). This court determined that in Maynard v. Cartwright, supra, the Supreme Court did not strike down this aggravating circumstance as facially unconstitutional, but rather held that it was unconstitutionally applied in that particular case, as the jury was given no guidance as to the facts to which it should pertain. In Bui v. State, supra, this court held that, because the trial judge instructed the jury on the meaning of the words of the aggravating circumstance, and because the trial court applied the correct standard for finding the aggravating circumstance, pursuant to Ex parte [Kyzer] Kyser, 399 So.2d 330, 334 (Ala. 1981), the sentence was not reversible."
Williams v. State, 571 So.2d 336 (Ala.Crim.App. 1989). In this case, the trial court thoroughly instructed the jury on the meaning of this particular aggravating circumstance and it correctly applied the standard set out in Ex parte Kyzer,399 So.2d 330 (Ala. 1981). (R.R.R. 101-03). The trial court's finding that the capital offenses in this case were particularly heinous, atrocious, and cruel when compared to other capital offenses is certainly supported by the evidence. One can think of few cases in which the brutality of the murders of this case could be exceeded.
 IX
During the presentation of the State's case, the appellant objected to the introduction of certain items into evidence. The prosecution's response to the appellant's objection is quoted below: *Page 408 
 "BY MS. BROOKS [deputy district attorney]: Judge, exhibit 28 is three books and 11 magazines found at the defendant's apartment, exhibit 29 is one additional magazine found in his apartment. The State expects to show through this witness, the finding of these exhibits, then through a witness, Phyllis Rollan, expert in Forensic Science that she analyzed the one magazine in 29, and that she's identified in that magazine a stain as semen on pages 25 through 30, positive for semen.
"BY THE COURT: Okay.
 "BY MS. BROOKS: The magazines and books are of a nature commonly called detective magazines, which primarily contain stories and photographs of killings. The magazine in question, number 29, including the semen stain involves a story of a woman who was knifed to death, and a sexual assault and attack, with multiple knives used."
(R. 313.) The appellant contends that the admission of the books and magazines into evidence was error. Wide latitude is accorded both parties in a criminal case in presenting evidence of the accused's mental state when the sanity of the accused is at issue. State v. Anthony, 565 So.2d 565 (Ala. 1990). "The only requirement is that prior acts must have a tendency to shed light on the accused's state of mind when the act for which he is being tried was committed." Miller v. State,460 So.2d 227, 228 (Ala.Crim.App. 1983).
 "If an accused, who pleads not guilty by reason of insanity to a charge of a crime, introduces evidence warranting a finding of such insanity, the state may introduce evidence of the commission of other crimes and misdeeds by the accused. Such evidence is held admissible to show that the criminal act charged was not the offspring of a mental disease but of a wicked propensity. The power of the state to introduce evidence of other crimes includes the right to introduce misdeeds of the accused not amounting to a crime but having a tendency in reason to prove his sanity. It should be emphasized that, despite the application of the wide-latitude rule, the state does not have the right to introduce evidence of all former crimes and misdeeds by the accused. The state may only prove such crimes and misdeeds when they also show some action by the accused with reference to such crime or misdeed that is relevant to his mental capacity."
C. Gamble, McElroy's Alabama Evidence, § 61.01(8) (4th ed. 1991).
Both victims in this case were stabbed repeatedly and were mutilated with a knife. One of the victims was sexually assaulted during the murder, and the other victim was so mutilated that the forensic pathologist was unable to tell whether this victim had been sexually assaulted. The books and magazines at issue contained articles depicting grisly crimes. An article in exhibit 29 entitled "Which Came First, Rape or Murder?" detailed the rape and stabbing death of a female. This evidence tends to show that the appellant may have planned these murders or thought about performing the acts depicted in the books and magazines. Clearly, this evidence was relevant to the appellant's state of mind when he committed the murders.
Although it may have been the better practice for the State to have reserved this evidence until the appellant raised his insanity defense, we do not believe that the appellant was harmed by the admission of this evidence during the State's case-in-chief. Defense counsel told the jury during opening arguments that the appellant had pleaded not guilty by reason of insanity and that the defense intended to put on experts who would testify that the appellant was suffering from a mental disorder when these crimes occurred. Thus, the State, in anticipation of the appellant's insanity defense, had a right to produce evidence rebutting the appellant's defense.
 X
This Court is required by § 13A-5-53, Code of Alabama 1975, to review the propriety of the appellant's sentence of death and to examine the record in this case for plain error. Rule 45A, A.R.App.P.
We have reviewed the trial court's findings concerning the aggravating and mitigating circumstances in this case. The trial court *Page 409 
found three aggravating circumstances: 1) that the capital offenses were committed while the appellant was under sentence of imprisonment; 2) that the defendant had previously been convicted of another capital offense or felony involving the use of violence to the person; and 3) that the capital offenses were especially heinous, atrocious, or cruel when compared to other capital offenses. The trial court considered non-statutory mitigating circumstances such as the expert testimony concerning his sanity, including his history of alcohol abuse and the fact that the appellant had been a model prisoner. While the trial court considered the evidence pertaining to his insanity plea and his history of alcohol abuse, it did not find that this evidence established the statutory mitigating circumstance that the capital offenses were committed while the appellant was under the influence of extreme mental or emotional disturbance or the mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
Our review of the record leads us to conclude that the trial court's findings are supported by the record. We find no evidence that the appellant's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances convinces us that death is the appropriate and proper sentence in this case.
Furthermore, the appellant's sentence of death is not disproportionate to the penalty imposed in similar cases, considering the crime and this appellant. Boyd v. State,542 So.2d 1247 (Ala.Crim.App. 1988), aff'd, 542 So.2d 1276, cert.denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989);Hooks v. State, 534 So.2d 329 (Ala.Crim.App. 1987); Holladayv. State, 549 So.2d 122 (Ala.Cr.App. 1988), aff'd,549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575,107 L.Ed.2d 569 (1989).
We have carefully considered the additional issues raised by the appellant in his supplemental brief on remand from the Alabama Supreme Court and we find that they are without merit. Further, pursuant to Rule 45A, A.R.App.P., we have thoroughly reviewed the record in this case, and we find no error that adversely affected this appellant's rights during the guilt or sentencing phase of this trial. The appellant's convictions for these capital offenses and his sentence of death are proper. The judgment of the trial court is affirmed.
AFFIRMED.
All the Judges concur.
[1] Rule 1.5, A.R.Crim.P., states that the Alabama Rules of Criminal Procedure "shall govern all proceedings, without regard to when the proceeding was commenced." Compare Russellv. City of Alexander City, 599 So.2d 86 (Ala.Crim.App. 1992).
[2] The attached document included a verbatim recitation of the items listed in Dr. Davis's report and the names of several psychological tests.
[3] It appears from the colloquy that was had on Thursday that Judge Price was willing to issue a subpoena to make sure that the experts would bring all of the documents to trial that they relied on in arriving at their respective expert opinions with regard to the appellant's sanity.