The defendant, Raymond Eugene Brown, was found guilty of the murder of two persons pursuant to one scheme or course of conduct, an offense made capital by Ala. Code 1975, §13A-5-40(a)(10); murder while the defendant was under a sentence of life imprisonment, made capital by §13A-5-40(a)(6); and murder during sexual abuse in the first or second degree, made capital by § 13A-5-40(a)(8). He was sentenced to death. The Court of Criminal Appeals reversed the judgment of conviction, with an opinion, and remanded the case to the trial court. Brown v. State, 571 So.2d 345
(Ala.Crim.App. 1990). The Court of Criminal Appeals held that the trial court's voir dire examination of the jury venire was not sufficient to allow it to make an independent determination as to whether the jurors' impartiality had been destroyed by the extensive publicity in the case. This Court granted the State's petition for a writ of certiorari, but later quashed the writ as improvidently granted. Brown v. State, 571 So.2d 353 (Ala. 1990).
Subsequently, the State filed a petition for a writ of certiorari from the United States Supreme Court. The petition was granted, and the Supreme Court vacated the judgment and remanded the case to the Court of Criminal Appeals for reconsideration in light of Mu'Min v. Virginia, 500 U.S. 415,111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). Alabama *Page 15 v. Brown, ___ U.S. ___, 111 S.Ct. 2791, 115 L.Ed.2d 966 (1991). In Mu'Min, the Supreme Court held that the procedure used by the trial judge (questioning in panels of four) did not violate the defendant's Sixth Amendment right to an impartial jury and his right to due process under the Fourteenth Amendment. On remand, the Court of Criminal Appeals again reversed the conviction, holding that this case is distinguishable fromMu'Min. Brown v. State, 586 So.2d 991 (Ala.Crim.App. 1991). We have granted the State's petition for certiorari review.
On August 10, 1987, the bodies of Linda LeMonte and her daughter, Sheila Smoke, were found in their home. Dr. Allan Stillwell testified that LeMonte died as a result of a nine-inch cut to her throat and that Smoke died as a result of multiple stab wounds to the chest, throat, and abdomen. On August 12, 1987, Brown was arrested for the murders.
Prior to voir dire of the venire, the defendant moved for individual voir dire, based on the pretrial publicity of the case. The judge denied the motion, but during voir dire asked the following question: "Now, ladies and gentlemen, does anyone know anything about this case, either what you have heard, read, know first-hand, news media, anybody know anything about this case?" Of the 66 members of the jury venire, 42 members (or 63%) responded affirmatively. The trial judge then continued:
 "All right. Now, ladies and gentlemen, those of you who stood and stated that you had either read, heard, or talked about this particular case, this is one of the most crucial questions I have asked all morning. This is the question where the seriousness of your oath will come forth. You will understand the seriousness of it again, the only thing this court, — the thing this court is required to do, and these lawyers are required to do, is to strike or empanel a fair and impartial jury. That's what the system requires. That's what we intend to do. Is there any member of the venire who has heard, read, talked about, knows anything about this case, or believes that you have already formed some opinion, have any preconceived ideas, have [a] predisposition to the extent that it would interfere with your ability to go into the jury room with the rest of the jurors, . . . absorb the evidence, listen to the evidence, weigh it, sift through it, and, at the appropriate time, render a fair and impartial verdict, based on the evidence and the law that I charge you is applicable in this case? I'm going to give you until 1:30 to make that decision, because we are going to take a lunch break. I want to let you think about that question because that's the crucial question in this case, whether those that have read or heard something about this case, could you still be a fair and impartial juror? Court will be in recess until 1:30."
After the lunch break, the following occurred:
 "BY THE COURT: All right, the question I asked you just before lunch, any member of the venire believes or those that stood [and] said that you had heard, read, talked about this matter, either one of you feel that it would interfere with your ability to render a fair and impartial verdict with the rest of the jurors, after listening to the evidence and the law that I charge you that is applicable in this case? If you would, please stand. Any further questions?"
Defense counsel then stated that because of the unusual amount of pretrial publicity and the intense amount of interest this case had generated in the community, he wished to individually question the prospective jurors concerning what they had heard or read about the case in order to determine the extent of what the jurors knew about the case. Defense counsel further stated that he did not believe that the jury had been thoroughly examined on the issue of pretrial publicity, and he added, "Human nature [is] such that people will not readily get up and admit in a courtroom in front of a judge, who is the ultimate symbol of impartiality, that they cannot be fair . . . reasonable and . . . objective." In response, the judge stated:
 "I have painstakingly and in great detail voir dired this jury venire, okay? And I believe that I have done it about as thoroughly *Page 16 
as it could have been done. Now, I don't know any other way for me to make the jurors say pretrial publicity would affect them other than ask them the questions the way I have asked them. Now, you know, I can't, and I don't think I should go to the extent, and I'll — not only the law but fairness doesn't require me to go to extent of having carte blanche exposition of asking the jurors questions, especially the detailed way in which I have voir dired this jury, and trying to seek out, ferret out their views about certain things."
The judge further stated that he believed that individual voir dire was necessary only if a prospective juror equivocated as to whether he or she could be fair and impartial. The trial judge then asked the jury venire:
 "Does any . . . member of the venire know of any reason, any reason whatsoever that you believe that you should not be selected to serve on this jury? If you do, stand, I'll take you in chambers and find out what the reason is. . . . Anyone has any predisposed position about this case . . . ? Anyone in your mind feel that you could not be fair in this matter, or render a fair, impartial verdict?"
In response to those questions, two of the jurors admitted that they could not be fair and impartial. These jurors were excused. The judge denied defense counsel's renewed request for individual voir dire.
The issue before this Court is whether the Court of Criminal Appeals erred when it held that the instant case is distinguishable from Mu'Min v. Virginia, 500 U.S. 415,111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).
In Mu'Min, the following had been reported in the news media: (1) Mu'Min's previous criminal history; (2) the details of the charged crime; (3) the fact that Mu'Min had been rejected for parole six times; (4) the details of the prior murders of which Mu'Min had been convicted; (5) Mu'Min's prison infractions; (6) the fact that the death penalty had not been available at the time of the previous murders; (7) the fact that Mu'Min had confessed to the charged crime; and (8) the opinion of local officials that Mu'Min was guilty. There had been 47 newspaper articles published related to the murder.
Further, in Mu'Min the petitioner submitted 64 proposed voir dire questions to the trial judge and filed a motion for individual voir dire. The trial judge denied the motion for individual voir dire, but he separated the venire into panels of four to deal with the issue of publicity. If a veniremember stated that he or she had acquired information about the alleged offense or the accused from the news media or from any other source, the judge then proceeded to ask each person individually whether the information he or she had received affected that person's impartiality in the case. The defendant in Mu'Min argued that the judge's failure to question the veniremembers about the specific content of the news reports to which they had been exposed violated his Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to due process. The Supreme Court held that the trial judge had only to examine the extent of the exposure to the prejudicial publicity in order to determine whether a juror could act impartially.
In the instant case, Brown filed a request for individual voir dire because of the pre-trial publicity. The trial judge denied this request and proceeded to ask the venire as a whole whether the members could be impartial. Some of the types of pre-trial publicity involved in this case were as follows: (1) 53 front page newspaper articles; (2) radio broadcasts (lead stories); (3) deputy district attorney's statements to the effect that this case was "[o]ne of the most graphically horrible cases we've had since I've been a D.A.," and that "if any case called for the electric chair, Brown's does"; (4) a reference by the Montgomery chief of police to the crime scene as "one of the most hideous . . . in this area in a long time"; (5) publication of the details of the defendant's prior crimes; and (6) statements by the prosecutor to the effect that the defendant had admitted the crime.
This case is virtually indistinguishable fromMu'Min. The only meaningful factual difference between this case and Mu'Min is that the trial judge in Mu'Min broke the venire into panels of four to determine *Page 17 
whether the jurors could be impartial, whereas in this case the trial judge asked the venire as a whole whether the members could be impartial. The method of determining impartiality is not critical. The crucial requirement is that the trial court get enough information to make a meaningful determination of juror impartiality. As the Court in Mu'Min stated:
 "Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning: is this juror to be believed when he says he has not formed an opinion about the case?"
500 U.S. at ___, 111 S.Ct. at 1905.
After carefully reviewing the record, we conclude that the trial judge acquired adequate information from the venire to make an independent determination as to whether the jurors would be impartial. Therefore, the judgment of the Court of Criminal Appeals is reversed and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MADDOX, ALMON, ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.