STUART, Justice.
In February 2008, a Mobile County grand jury charged Lam Luong with five counts of capital murder in connection with the deaths of his four children. The murders were made capital because: (1) two or more persons were killed “by one act or pursuant to one scheme or course of conduct,” see § 13A-5-40(a)(10), Ala.Code 1975; and (2) each child was less than 14 years of age when he or she was murdered, see § 13A-5-40(a)(15), Ala.Code 1975. Following a jury trial, Luong was convicted of five counts of capital murder. The trial court sentenced Luong to death for each of the five capital-murder convictions. The Court of Criminal Appeals reversed Luang’s convictions and death sentences, holding that the trial court erred by refusing to move the trial from Mobile County because, it reasoned, the pretrial publicity was presumptively prejudicial and by refusing to conduct individual questioning of the potential jurors regarding their exposure to that publicity. The Court of Criminal Appeals also held that the trial court erred in denying defense counsel funds to travel to Vietnam to investigate mitigation evidence and in admitting into evidence during the sentencing healing a videotape simulation using sandbags approximately the weight of each child illustrating the length of time it took for each child to fall from the bridge to the water.[1] Luong v. State, 199 So.3d 98 (Ala.Crim.App.2013). This Court granted the State’s petition to review the decision of the Court of Criminal Appeals. We reverse and remand.

Facts

In its sentencing order, the trial court presented the following facts surrounding the offenses:
“[Luong] met Kieu Phan, the children’s mother[,] in 2004. She lived in Irvington and he was working on a shrimp boat in Bayou La Batre. At the time, she was pregnant with Ryan, and although not [Luang’s] biological child, he treated Ryan as his own. Thereafter, [Luong] and Kieu had the three other children, Hannah, Lindsey, and Danny.
“Some time after Hurricane Katrina in August of 2005, they moved to Hines-ville, Georgia. Kieu worked in a nail salon and [Luong] first worked at a car wash and then took a job as a chef at a restaurant. But it was also in Hinesville that marital problems arose. [Luong] took a girlfriend, he wouldn’t work, and he was smoking crack. Kieu was upset by this and decided to move back to Irvington with the children and move in with her mother. [Luong] followed along. This was in December of 2007, approximately a month before he killed the children. Back in Irvington things did not improve. He still had a girlfriend, still did not work regularly, was asking Kieu and her mother, Dung, for money, and was using the money to buy crack and was staying out all night. The family was not happy with his be *144 havior and communicated their displeasure to him.
“Monday morning, January 7, 2008, around 8:30 a.m., [Luong] took Hannah, Lindsey, and Danny and put them in the family van and left the house. A few minutes later, he returned and got Ryan. It was then that he made the 15-20 minute drive with his children to the top of the Dauphin Island Bridge and threw them to their deaths.
“Ryan Phan was 3 years and 11 months old, Hannah Luong was 2 years and 8 months old, Lindsey Luong was 1 year and 11 months old and Danny Luong was 4 months old. On Jan. 7, 2008, [Luong] put them in the family van, drove them from their home in Irvington to the top of the Dauphin Island Bridge. There, he pulled the van over to the side of the roadway and threw all four children, one by one, over the rail, some 106 feet, to their deaths in the water below.
“After leaving the bridge, the van was running out of gasoline. Luong set about trying to get gas and then obtaining money from Kieu to buy crack. Several witnesses testified about their encounters with [Luong] as he was trying to enlist their assistance in obtaining gasoline. They all said that he did not appear to be under the influence of drugs or alcohol. A video from a Chevron gas station also showed [Luong] attempting to obtain gas shortly after throwing the children from the bridge. He did not appear at all impaired.
“[Huong’s] day’s travels, after killing his children, ended around 5:30 p.m. when the van had a flat tire and a wrecker towed him home. Kieu’s mother, Dung, had been calling him all day to find out where the children were but Luong would not answer the phone. [Luong] informed her that he gave the children to a woman named Kim who acted like she knew the family and Kim had not returned the children. When Kieu learned of this, she insisted he report the children missing, which he did.
“At the Bayou La Batre police station the night of January 7, 2008, [Luong] maintained the story that he gave the children to a woman named Kim who never returned the children. There were some variations in the different versions he related, but the essential ‘theme’ was that he gave the children to a woman named Kim.
“The next day he told Captain Darryl Wilson that if Wilson would take him to Biloxi, Mississippi, that maybe they could find Kim. Captain Wilson took [Luong] to Biloxi, but after riding around for about an hour, [Luong] stated that he did not know where to find the children. They returned to the Bayou La Batre police department and shortly thereafter [Luong] told his wife, Kieu, that the children were dead. He further informed Captain Wilson that .the children were in the water, and he agreed to take Captain Wilson to the location. [Luong] directed Captain Wilson to the top of the Dauphin Island Bridge and pointed out the exact locations where he parked the van and threw the children into the water below.
“[Luong] subsequently gave a recorded statement in which he admitted throwing his children into the water from the bridge. He stated, ‘My family they make me.’ He said his family and his wife looked down on him like he was nothing. Captain Wilson asked [Luong] if he contemplated "killing himself when he was on the bridge and [Luong] said he did. However, when Captain Wilson inquired why he did not, [Luong] said, T wanted to see what my wife and family *145 looked like.’ Wilson replied, Ton wanted to watch your wife’s face after you told her that you 'had ■ killed them?’ [Luong]- nodded in the affirmative and said, ‘Uh-huh.’
“Several witnesses driving across the bridge at the time [Luong] was in the act of throwing his children off of the bridge one at a time witnessed various parts of the events. Howard Yeager saw a van matching the description of [Luong’s] van on top of the bridge during the relevant time period. Jeff Coolidge saw [Luong] parked in the location where [Luong] pointed out he was parked, and saw [Luong] throw something over the side. As Coolidge got closer to the van he saw three toddlers in the van. Alton Knight, in another vehicle, saw a van matching the description of [Luong’s] van and observed a little girl, a toddler, with dark hair and pigtails in the van. (The children’s grandmother, Dung, testified that Lindsey had pigtails when she left that morning.) Frank Collier, who was in the vehicle with Alton King, saw a van matching the description of [Luong’s] van and saw [Luong] straddling the rail of the bridge. ,. .
“The next day ... [Luong] was interviewed again,- and at this time he recanted his earlier statement, and reverted back to the ‘Kim’ story. He smiled and told Captain Wilson, ‘If you find the bodies, then you charge me.’
“Before any of the bodies were found, but after he had been arrested and was in jail, Luong called his wife from the jail and during the conversation laughed and told, her that no one would find the children.
“A massive search effort began. On Saturday, January 12, 4-month-old Danny'was found 12.5 miles-.west of the bridge on the banks of an isolated marsh area. On Sunday, January 13⅜ 3-year-11-month-old Ryan was found 16.4 miles' west of the bridge. On Tuesday, January 15, 1-year-ll-month-old Lindsey was found in Mississippi, 18 miles west of the bridge and five days later, on January 20, 2-year-ll-month-old Hannah was located floating in the Gulf of Mexico, south of Venice, Louisiana, 144 miles west of the bridge.
- “The cause of death for Ryan, Danny and Lindsey was blunt force trauma and asphyxia due to drowning. The cause of death for Hanna was drowning.
"....
“The most convincing evidence of Luong’s guilt was his confession to throwing his children off the Dauphin Island Bridge, which was corroborated by [Luong] pointing out the location of the murders, and by witnesses who saw ''either him or children matching the description of his children on the bridge at the time he said he threw them into the water. This was further corroborated by the locations where- the 'bodies of the children were later found.”

Analysis

I.
First, the State contends that the decision of the Court of Criminal Appeals that “Luong’s case represents one of those rare' instances where prejudice must be presumed,” 199 So.3d at 122, conflicts with Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), and Ex parte Fowler, 574 So.2d 745 (Ala.1990). The State maintains that the holdings of the Court of Criminal Appeals that the evidence indicated presumed prejudice against Luong and that his case' should have been transferred to another venue ignores two important principles: the principle that criminal trials should be held in the communities where the crimes oc *146 curred and the principle that the law vests the trial court with discretion in determining how to ensure the- impartiality of a jury. The State acknowledges that “[i]n today’s world, when a crime is committed that is as incomprehensible as Luong’s, the media-will extensively cover it as a matter of course,” but- it emphasizes that “the advent.of 24-hour news and the internet” does not mean that a fair trial cannot be conducted in the community where the offense was committed.
In Shilling, the United States Supreme Court examined whether the publicity attending the securities scandal involving Enron Corporation prevented an Enron executive charged with criminal conduct from receiving a fair trial in Houston, Texas, where Enron’s corporate headquarters were . located. The Supreme Court recognized that media coverage of the crimes did not alone create a presumption that a trial in the venue where the offense was committed necessarily deprived the defendant of due process and that “[a] presumption of prejudice ... attends only the extreme case.” 561 U.S. at 380, 130 S.Ct. at 2915. The Supreme Court then examined the pretrial publicity and alleged community prejudice in that case, in light of the following factors: (1) the size and characteristics of the community where the offenses occurred; (2) the .content of the media coverage; (3) the timing of the media coverage in relation to the trial; and (4) the media interference with the trial or its influence on the verdict. Skilling, 561 U.S. at 380-85, 130 S.Ct. at 2915-17. The Supreme Court concluded that no presumption of prejudice existed in Skilling.
In Ex parte Fowler, this Court reviewed whether the trial court exceeded the scope of its discretion in denying a defendant’s request for a change of venue for her new trial. This Court stated:
“It is well established in Alabama, however, that the existence of pretrial publicity, even if extensive, does not in and of itself constitute a ground for changing venue and thereby divesting the trial court of jurisdiction of an offense. Beecher v. State, 288 Ala. 1, 256 So.2d 154 (1971), rev’d on other grounds, 408 U.S. 234, 92 S.Ct. 2282, 33 L.Ed.2d 317 (1972); see, also, the cases annotated at § 15-2-20. In Nelson v. State, 440 So.2d 1130 (Ala.Crim.App.1983), the Court of Criminal Appeals correctly noted that jurors do not have to be totally ignorant of the facts and issues involved in a particular case in order to reach an unbiased verdict. Quoting Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751, 756 (1961), the court further noted:
“ ‘ “In these days of swift, widespread and diverse methods of communication, an important case can-be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a -verdict based on the evidence .presented in court.” ’
“440 So.2d at 1131. To satisfy her burden of proof in the present case, [the defendant] had to establish that prejudicial pretrial publicity has so saturated [the county] as to have a probable prejudicial impact on the prospective jurors *147 there, thus rendering the trial setting inherently suspect. This required a showing that a feeling of deep and bitter prejudice exists in [the county] as a result of the publicity. Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988), aff'd Ex parte Holladay, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).”
574 So.2d at 747-48.
Unequivocally, the record establishes that the media coverage of these offenses and the proceedings before Luong’s trial were extensive; however, this fact alone does not support a finding of presumed prejudice. To make such a determination, this Court considers the pretrial publicity and- the alleged community prejudice in light of the Skilling factors.
A. The size and characteristics of the community where the offenses occurred.
The record establishes that Mobile County has a large and diverse population. According to the 2010 census, Mobile County was Alabama’s second largest county with a population of over 400,000 citizens. Even though the record indicates that a large percentage of Mobile County residents read the local newspaper, the size of the population of Mobile County reduces the likelihood of prejudice. In light of Mobile County’s large population and its diverse pool of citizens, this Court is reluctant to conclude that 12 impartial jurors could not be empaneled. See Gentile v. State Bar of Nevada, 501 U.S. 1030, 1044, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991)(plurality opinion)(recognizing that the likelihood of a presumption of prejudice was less because venire was selected from pool of over 600,000 residents). But see Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (finding a presumption of prejudice in a case where the offense was committed in a community of 150,000 residents).
B. The content of the media coverage.
As previously observed, the record clearly establishes that the newspaper, television, and radio coverage of the offenses and the subsequent proceedings were extensive. However, as the State maintains:
“[I]f exposure to a certain level of pretrial publicity renders a community presumptively unable to convene an impartial jury, then no venue will be acceptable, and no trial will be possible, in any case that draws significant national attention.”
The Court of Criminal Appeals provides a thorough summary of the content of the articles published in the Mobile Press-Register, the local newspaper of Mobile County, that are contained in the record, see Luong v. State, 199 So.3d at 113-19. This Court has reviewed those articles and concludes that, although they do not paint a flattering picture of Luong, the media coverage mainly focused on the facts surrounding the offenses and the proceedings of the case. Additionally, the majority of the information contained in the media reports was admitted into evidence at trial. This Court has also reviewed the personal opinions expressed through comments on the newspaper’s Web site, the call-in telephone line, and the editorial pages. Although statements were made condemning Luong, other statements were made to the effect that Luong “was entitled to his day in court.” This Court cannot conclude that, in this age of digital communication, the published opinions of certain of the citizens in this particular community constitute grounds for presuming that a fair trial could not be conducted in Mobile *148 County. Cf. Woodward v. State, 123 So.3d 989, 1050 (Ala.Crim.App.2012).
This Court has also considered Luong’s argument that the media coverage of Luong’s confession and the withdrawal of his guilty plea amounted to "the kind of deeply prejudicial pretrial exposure that jurors cannot be reasonably expected to ignore.” However, in light of the admission into evidence at trial of Luong’s confession in which he admitted that he threw his children off the bridge, the publicity about his confession and guilty-plea proceeding did not result in a preconceived prejudice that permeated the trial, preventing the seating of a fair and impartial jury.
A review of the record simply does not support a finding that the content of the media coverage incited anger, revulsion, and indignation to the degree that jurors chosen from citizens of Mobile County could not determine Luong’s guilt or innocence based solely on the evidence presented at trial.
C.The timing of the coverage in relation to the trial.
Luong admitted to this Court that 45 of the 59 articles published in the Mobile Press-Register and cited in the opinion of the Court of Criminal Appeals were published more than a year before his trial.[2] Indeed, the record establishes that the majority of the media coverage occurred during the first month following the offenses. The fact that the majority of the publicity occurred more than a year before the trial supports a conclusion that a fair and impartial jury could be selected from the community. See Ex parte Travis, 776 So.2d 874, 879 (Ala.2000) (holding that prejudice is unlikely as a result of publicity that occurred more than a year before the trial).
D. The media interference with the trial or its influence, on the verdict.
The record establishes that the trial court ordered certain precautions to ensure that the media did not interfere with the trial or that media representatives did not have contact with,the jurors. Such procedures are precisely the type of preventive measures courts should take to avoid tainting the jury. Nothing in the record indicates that the media interfered •with Luong’s trial.
In Skilling the United States Supreme Court found that the jury’s acquittal of Skilling of several counts with which he had been charged supported its conclusion that a presumption of prejudice did not exist. However, in light of the facts of this case, in particular Luong’s admission that he threw each of his children off the bridge, the fact that Luong was not acquitted of any of the charged offenses does not either support or rebut a presumption of jury bias or impartiality. The evidence in this case simply did not create any inference from which the jury could conclude that he killed some, but not all, of his children. Therefore, in light of the facts of this case, the jury’s verdict neither supports nor negates a finding of presumed prejudice.
E. Additional factor raised by Luong.
This Court has also considered Luong’s argument that the “Mobile community’s close involvement with the case” ^resulted *149 in prejudice that prevented a fair trial. The Court of Criminal Appeals relied on State v. James, 767 P.2d 549 (Utah 1989), and Rideau in reaching its conclusion that prejudice was presumed. After examining those cases in. light of the facts of this case, this Court concludes that those cases are distinguishable.
In State v. James, the size of the community and the actions of the defendant are substantially different than here. The James community was much smaller than the community in this case. The town where the offense in James was committed had a population of 28,880; the county had a population of 69,200. In this case, the populations of Mobile and Mobile County are substantially larger.[3] Additionally, the James community engaged in a rescue effort much more widespread than the one in this case. The defendant in James played the role of victim and deceived the public by leading the citizens to believe that the child was alive and could be rescued, resulting in a massive search when the defendant knew that the child was dead. The James community searched for a missing child reported to be alive; here, the publicity about and search for the children occurred after the children were dead. Luong did not deceive the Mobilé community; the community involvement began after he admitted that the children were dead, and the community then assisted in the recovery of the bodies. The small size of the community and the actions of the defendant in James supported a finding of presumed prejudice in light of the community’s involvement in a rescue effort and its frustration over the defendant’s deception. In this case, the larger population of Mobile County and the facts surrounding the involvement of the community in the search for the bodies make these facts and circumstances less inflammatory than the facts and circumstances in James and did not create an environment where prejudice must be presumed.
Rideau is the “seminal” case discussing prejudice presumed from pretrial publicity. The evidence in Rideau established that the offense was committed in a community of 150,000 residents and that an “out-of-court” trial of Rideau was conducted when the media published Rideau’s interrogation and confession. In this case, the media did not broadcast a tape-recording of Luong’s confession, and, although the media did report on Luong’s guilty-plea proceeding, the report was objective and detailed a public event that transpired in court. Because Luong was not “tried” in the media and because the community of Mobile is larger than the community in Rideau, Rideau is distinguishable.
Finally, this Court has considered the decision in Wilson v. State, 480 So.2d 78 (Ala.Crim.App.1985), reversing a trial court’s order refusing to transfer a case. The offense in Wilson occurred in a town of less than 10,000, and the community encouraged the local officials to arrest the defendant. The evidence indicated that the public believed that Wilson, a white male, had killed one of his employees, a black male. When the sheriff refused to arrest Wilson, there was public outcry. Evidence was presented that 20 years earlier Wilson’s grandfather had been tried for the murder of a young black activist and found-not guilty. Additionally, testimony was presented that community talk indicated that Wilson’s trial was an opportunity to avenge the death of the black activist at the hands of Wilson’s grandfather. The Court of Criminal Appeals held that the record disclosed that “bias and prejudice” against Wilson permeated the community and that the trial court had *150 exceeded the scope of its discretion in denying Wilson’s motion for a change of venue.
Unlike the record in Wilson, the record in this case does not establish that bias and prejudice permeated the Mobile community at the time of Luong’s trial. Although the facts surrounding the offenses in this case are inflammatory, no evidence indicates that the community demanded Luong’s arrest or that an underlying bias against Luong existed at the time of trial.
This Court acknowledges that the record supports a finding that the community of Mobile grieved over the tragic deaths of the four children. The community exhibited its compassion by helping to search for the children’s bodies and its generosity by raising funds to pay for funeral expenses for the children. This type of community involvement, however, does not create a presumption of bias against Luong; rather, it indicates the humanity and mercy of the citizens of Mobile County. We cannot conclude that such acts support a finding that Luong could not receive a fair trial in Mobile County.
After considering the pretrial publicity, the community involvement, and the alleged resulting community prejudice in this case, in light of the size and characteristics of Mobile County, the content of the pretrial publicity, the timing of media coverage in relation to Luong’s trial, and the lack of media interference with the trial or influence on the verdict, this Court concludes that this case does not present “one of those rare instances where prejudice must be presumed,” 199 So.3d at 122, i.e., that the publicity was so prejudicial that the jurors could not decide the case fairly. Unquestionably, the record establishes that members of the venire recalled the offenses; however, the record does not support the conclusion that the community’s initial feelings of shock and reprehensibility at the time the offenses were discovered were present in the venire for Luong’s trial.
“If, in this age of instant, mass communication, we were to automatically disqualify persons who have heard about an alleged crime from serving as a juror, the inevitable result would be that truly heinous or notorious acts will go unpunished. The law does not prohibit the informed citizen from participating in the affairs of justice. In prominent cases of national concern, we cannot allow widespread publicity concerning these matters to paralyze our system.”
Calley v. Callaway, 519 F.2d 184, 210 (5th Cir.1975). See also Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (recognizing that “[i]t is not unusual that one’s recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion have passed”). Therefore, this Court holds that the trial court did not exceed the scope of its discretion in refusing to find presumed prejudice against Luong and refusing to transfer his case on that basis, and the judgment of the Court of Criminal Appeals in. this regard is reversed.
II.
Next, the State contends that the Court of Criminal Appeals’ holding that the trial court’s refusal to conduct individual voir dire of the venire concerning the effects of the pretrial publicity on the veniremembers’ capacities to be fair precluded Luong from showing actual prejudice conflicts with cases that hold that a trial court has wide discretion in conducting voir dire and in making determinations of juror bias and prejudice. See Skilling, 561 U.S. at 386, 130 S.Ct. at 2917 (recognizing that “[n]o hard-and-fast formula dictates the necessary depth or breadth of *151 voir dire ” and that “[j]ury selection ... is ‘particularly within the province of the trial judge’ ”); and Patton v. Yount, 467 U.S. at 1036 (noting that the trial court must determine “did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror’s protestation of impartiality have been believed”). According to the State, the trial court’s use of juror questionnaires and its questions posed to the venire adequately provided the trial court and the parties an opportunity to determine whether the veniremembers could base their decision on the evidence presented at trial. The State admits that individual voir dire of the venire is the “preferred approach” as a matter of policy when a case involves extensive publicity but maintains that the trial court’s procedures in this case satisfied the requirements of the established law, adequately assessed the risk of bias and prejudice among the veniremembers, and did not render the process of jury selection constitutionally deficient.
To assist the trial court and the parties in determining the effect of the pretrial publicity on the venire, the trial court required the veniremembers to complete jury questionnaires and then to respond to questions propounded to the venire as a whole. The jury questionnaire asked each veniremember to answer the following questions:
“Did you read or hear anything concerning this case?”
“Before coming to the courthouse?”
“Since arriving at the courthouse?”
“If [you have read or heard anything about this case], what did you hear?”
The questionnaire then asked the venire-member to identify the television programs he or she watched; the local news stations watched; the frequency with which the veniremember watched the news; the radio stations the veniremember listened to; and the periodicals, including magazines and newspapers, the venire-member read. During the voir dire, the following occurred:
“THE COURT: Now, listen to this question very carefully. Would any of you, based on what you have read, seen, or heard, or remember could you set those things aside and serve as a fair and impartial juror?
“In other words, is there any member of the jury who thinks because they have a recollection of this case, whether it be from radio, television, or newspaper, Internet, or any other source, that it would be impossible for you to put that aside, lay that aside and sit as a fair and impartial juror in this case and base your decision only on the evidence as you hear it in this courtroom?
“Can any of you — or would any of you tell me it would be impossible for you to sit as a fair and impartial jury in this case?
“(Response.)
“THE COURT: I see a hand in the back. Could you please stand, sir, and just give us your name and number?
“PJ [T.]: [T], 141.
“THE COURT: Mr. [T.], you are telling me that regardless of what you may have heard, read or seen, you are telling me that you in no way could set that aside and sit as a juror?
“PJ [T.]: No, sir.
“THE COURT: Thank you. Is it 144?
“PJ [TJ: 141.
*152 “THE COURT: All right. The rest of you are telling me that even though you may have heard, read, or seen matters about this case, and you may have had some preconceived impression or opinion, based on what you have heard, read or seen, that you could sit as a juror in this case, base your verdict only on the evidence as it comes from the witness stand and any evidence as it comes from the witness stand and any evidence that may be introduced into evidence in the form of photographs or documents or something, and you could render a fair and impartial verdict by setting aside any of that and base your verdict on the evidence that you hear in this courtroom? You can do that?
“(No response.),
“THE COURT: If you can’t, other than Mr. T., please raise your hand.
“(No response.)”
When Luong preserved his objection to the trial court’s denial of his motion to conduct individual voir dire with regard to pretrial publicity, the trial' court responded:
“Okay. First of all, it’s my reading of the law that individual voir dire is not a requirement and it is not a right. Only where the Court feels, in its discretion, that it is necessary to explore other areas more thoroughly is an individual voir dire preferable.
“Secondly, the Court has gone to a significant length to have the attorneys for both parties develop a lengthy questionnaire. And this questionnaire was given to the venire on Monday, and they were give all the time needed, and encouraged by me to be thorough in then-answers in filling out the questionnaires.
“The Court then, at the' parties’ request, gave an entire day to go through these questionnaires, read them, and study them, so that they could more intelligently strike a jury.
“The law further says, as I read it from various cases dealing with change of venues and pretrial publicity, that even though a person might have a preconceived recollection based on pretrial publicity, if they say they can put aside what they have heard, read or seen, that’s all that’s necessary, if they can render a fair and impartial verdict based on the evidence as it is adduced at trial.

"....

“From my reading of the law, at least the Alabama Supreme Court is going to have to absolutely change 180 degrees its years of precedent in saying that I need to have or allow defense individual voir dire. Because no one other than Mr, [T.] indicated that they would have any problem whatsoever in sfetting aside anything that they may have heard, read or seen.”
In Ex parte Anderson, 602 So.2d 898, 899 (Ala.1992), this Court provided the standard of review for a trial court’s decision regarding whether to conduct individual voir dire, stating:
“Whether to allow individual voir dire examinations is within the trial court’s discretion. Hallford v. State, 548 So.2d 526, 538 (Ala.Crim.App.1988), affirmed, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). Furthermore, ‘“[t]he decision of the trial court in denying individual voir dire examination will not be disturbed absent abuse of that discretion.” ’ Henderson v. State, 583 So.2d 276, 283 (Ala.Crim.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)(quoting Hallford, 548 So.2d at 538).”
The United States Supreme Court in Skilling discussed the trial *153 court’s responsibility in selecting a fair and impartial jury and the appellate court’s deference in reviewing the selection process when pretrial publicity is at issue, stating:
“When pretrial publicity is at issue, ‘primary reliance on the judgment of the trial court makes [especially] good sense’ because the judge ‘sits in the locale where the publicity is said to have had its effect’ and may base her evaluation on her ‘own perception of the depth and extent of news stories'that might influence a juror.’ ... Appellate courts making after-the-fact assessments of the media’s impact' on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.
“Reviewing courts are properly resistant to second-guessing the trial judge’s estimation of a juror’s impartiality, for that judge’s appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the prospective juror’s inflection, sincerity, demeanor, candor, body language, and apprehension of duty.... In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member’s fitness for jury service.”
Skilling, 561 U.S. at 386-87, 130 S.Ct. at 2918.
In Ex parte Brown, 632 So.2d 14 (Ala.1992), this Court examined whether the trial court’s refusal to conduct individual voir dire even though the evidence established that the pretrial publicity with regard to the offense and the defendant was significant denied the defendant his right to an impartial jury. Because Brown discusses the United States Supreme Court decision in Mu’Min v. Virginia, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), addressing this issue and because both cases are analogous to this case, we quote extensively from the facts and analysis in Brown:
“On August 10, 1987, the bodies of Linda LeMonte and her daughter, Sheila Smoke, were found in their home. Dr. Allan Stillwell testified that LeM-onte died as a result of a nine-inch cut to her throat and that Smoke died as a result of multiple stab wounds to the chest, throat, and abdomen. On August 12, 1987, Brown was arrested for the murders.
“Prior to voir dire of the venire, the defendant moved for individual voir dire, based on the pretrial publicity of the case. The judge denied the motion, but during voir dire asked the following question: ‘Now, ladies and gentlemen, does anyone know anything about this case, either what you have heard, read, know first-hand, news media, anybody know anything about this case?’ Of the 66 members of the jury venire, 42 members (or 63%) responded affirmatively. The trial judge then continued:
“‘All right. Now, ladies and gentlemen, those of you who stood and stated that you had either read, heard, or talked about this particular case, this is .one of the most crucial, questions I have asked all morning. This is the question where the seriousness of your oath will come forth. You will understand the seriousness of it again, the only thing-this court, — the thing this court is required to do, and these lawyers are required to do, is to strike or empanel a fair and impartial jury. That’s what, the system requires. That’s what we intend to do. Is there any member of the venire who has heard, read, talked about, knows anything about this case, or believes that *154 you have already formed some opinion, have any preconceived ideas, have [a] predisposition to the extent that it would interfere with your ability to go into the jury room with the rest of the jurors, ... absorb the evidence, listen to the evidence, weigh it, sift through it, and, at the appropriate time, render a fair and impartial verdict, based on the evidence and the law that I charge you is applicable in this case? I’m going to give you until 1:30 to make that decision, because we are going to take a lunch break. I want to let you think about that question because that’s the crucial question in this case, whether those that have read or heard something about this case, could you still be a fair and impartial juror? Court will be in recess until 1:30.’
“After the lunch’ break, the following occurred:
“‘BY THE COURT: All right, the question I asked you just before lunch, any member of the venire believes or those that stood [and] said that you had heard, read, talked about this matter, either one of you feel that it would interfere with your ability to render a fair and impartial verdict with the rest of the jurors, after listening to the evidence and the law that I charge you that is applicable in this case? If you would, please stand. Any further questions?’
“Defense counsel then stated that because of the unusual amount of pretrial publicity and the intense amount of interest this case had generated in the community, he wished to individually question the prospective jurors concerning what they had heard or read about the case in order to determine the extent of what the jurors knew about the case. Defense counsel further stated that he did not believe that the jury had been thoroughly examined on the issue of pretrial publicity, and he added, ‘Human nature [is] such that people will not readily get up and admit in a courtroom in front of a judge, who is the ultimate symbol of impartiality, that they cannot be fair ... reasonable and ... objective.’ In response, the judge stated:
“T have painstakingly and in great detail voir dired this jury venire, okay? And I believe that I have done it about as thoroughly as it could have been done. Now, I don’t know any other way for me to make the jurors say pretrial publicity would affect them other than ask them the questions the way I have asked them. Now, you know, I can’t, and I don’t think. I should go to the extent, and I’ll — not only the law but fairness doesn’t require me to go to extent of having carte blanche exposition of asking the jurors questions, especially the detailed way in which I have voir dired this jury, and trying to seek out, ferret out their views about certain things.’
“The judge further stated that he believed that individual voir dire was necessary only if a prospective juror equivocated as to whether he or she could be fair and impartial. The trial judge then asked the jury venire:
“ ‘Does any ... member of the venire know of any reason, any reason whatsoever that you believe that you should not be selected to serve on this jury? If you do, stand, I’ll take you in chambers and find out what the reason is.... Anyone has any predisposed position about this case ... ? Anyone in your mind feel that you could not be fair in this matter, or render a fair, impartial verdict?’
*155 “In response to those questions, two of the jurors admitted that they could not be fair and impartial. These jurors were excused. The judge denied defense counsel’s renewed request for individual voir dire.
“The issue before this Court is whether the Court of Criminal Appeals erred when it held that the instant case is distinguishable from Mu’Min v. Virginia, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).
“In Mu’Min, the following had been reported in the news media: (1) Mu’Min’s previous criminal history; (2) the details of the charged crime; (3) the fact that Mu’Min had been rejected for parole six times; (4) the details of the prior murders of which Mu’Min had been convicted; (5) Mu’Min’s prison infractions; (6) the fact that the death penalty had not been available at the time of the previous murders; (7) the fact that Mu’Min had confessed to the charged crime; and (8) the opinion of local officials that Mu’Min was guilty. There had been 47 newspaper articles published related to the murder.
“Further, in Mu’Min the petitioner submitted 64 proposed voir dire questions to the trial judge and filed a motion for individual voir dire. The trial judge denied the motion for individual voir dire, but he separated the venire into panels of four to deal with the issue of publicity. If a veniremember stated that he or she had acquired information about the alleged offense or the accused from the news media or from any other source, the judge then proceeded to ask each person individually whether the information he or she had received affected that person’s impartiality in the case. The defendant in Mu’Min argued that the judge’s failure to question the veniremembers about the specific content of the news reports to which they had been exposed violated his Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to due process. The Supreme Court held that the trial judge had only to examine the extent of the exposure to the prejudicial publicity in order to determine whether a juror could act impartially.
“In the instant case, Brown filed a request for individual voir dire because of the pre-trial publicity. The trial judge denied this request and proceeded to ask the venire as a whole whether the members could be impartial. Some of the types of pre-trial publicity involved in this case were as follows: (1) 53 front page newspaper articles; (2) radio broadcasts (lead stories); (3) deputy district attorney’s statements to the effect that this case was ‘[o]ne of the most graphically horrible cases we’ve had since I’ve been a D.A.,’ and that ‘if any case called for the electric chair, Brown’s does’; (4) a reference by the Montgomery chief of police to the crime scene as ‘one of the most hideous ... in this area in a long time’; (5) publication of the details of the defendant’s prior crimes; and (6) statements by the prosecutor to the effect that the defendant had admitted the crime.
“This case is virtually indistinguishable from Mu’Min. The only meaningful factual difference between this case and Mu’Min is that the trial judge in Mu’Min broke the venire into panels of four to determine whether the jurors could be impartial, whereas in this case the trial judge asked the venire as a whole whether the members could be impartial. The method of determining impartiality is not critical. The crucial requirement is that the trial court get enough information to make a meaningful determination of juror impartiality. As the Court in Mu’Min stated:
*156 “‘Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning: is this juror to be believed when he says he has not formed an opinion about the case?'
“500 U.S. at 425, 111 S.Ct. at 1905.
“After carefully reviewing the record, we conclude that the .trial judge acquired adequate information from the venire to make an independent determination as to whether the jurors would be impartial.”
632 So.2d at 15-17.
This case is essentially indistinguishable from Brown and Mu’Min, the United State Supreme Court case discussed in Brown. Similar to the pretrial publicity in Brown and Mu’Min, the pretrial publicity in this case included numerous newspaper articles and radio and television broadcasts discussing the nature of the offenses, the potential punishments for the offenses, the details of the defendant’s life, and his confession to committing the offenses. Like the trial courts in Brown and Mu’Min, the trial court refused to conduct individual voir dire and obtained information from the veniremembers by propounding questions to the venire to determine whether the veniremembers would be impartial. Just as in Mu’Min and in Brown, the question to be answered by this Court is whether the trial court erred by accepting, without individual voir dire, the assurances of the seated jurors that they could put aside what they had read or heard and render a fair verdict based on the evidence.
Applying the precedent of the United States Supreme Court and this Court to the facts of this case, we cannot conclude that the trial court exceeded the scope of its discretion in denying Luong’s request that the trial court conduct individual voir dire. The record indicates that the trial court was acutely aware of the pretrial publicity, the local reaction to the crime, Luong’s reputation, and the alleged community prejudice. The record further reflects that the trial court was concerned about providing Luong with a fair and unbiased jury. The trial court’s determination that individual voir dire regarding pretrial publicity was not required was the culmination of a lengthy process that incorporated responses to questionnaires, responses or the lack thereof to oral inquiries about bias, and repeated admonishments to the venire of the need for candor. The trial court asked the veniremembers if they could determine the case based only on the evidence presented. With the exception of one veniremember, who was struck, the other véniremembers indicated that, even though they had knowledge of the case, they could set aside any preconceived notions and render a fair and impartial decision based upon the evidence. The record does not establish that any of the seated veniremembers indicated a potential bias based on his or her exposure to pretrial publicity. Only speculation and conjecture supports a finding otherwise. Individual voir dire is required only when there is an indication that the assurances of the seated jurors that they could put aside what they had read or heard and render a fair verdict based on the evidence are not genuine. The record in this case indicates that the veniremembers were contemplative of the trial court’s questions and, genuine in their responses. Although this Court may have employed different voir dire procedures, it cannot conclude that the trial court exceeded its discretion in denying individual voir dire with regard to the impact of the publicity, to uncover bias. Because the record does not establish that the veniremembers were not forthright with their responses that they *157 could render a fair verdict based on the evidence, and in light of the broad discretion vested in the trial court in conducting voir dire, the Court of Criminal Appeals erred in holding that individual voir dire was mandated, and its judgment in this regard is reversed.
III.
The State further contends the Court of Criminal Appeals’ holding that the trial court exceeded the scope of its discretion by denying Luong’s counsel funds to travel to Vietnam to interview family members to develop mitigation evidence conflicts with State v. Bui, 888 So.2d 1227 (Ala.2004). In Bui, this Court stated: “While we recognize defense counsel’s obligation to conduct a thorough investigation of a defendant’s background, the trial court must consider the reasonableness of the investigation.” 888 So.2d at 1230. We further opined that “ ‘a court must consider not only the quantum of the evidence already known to counsel, but whether the known evidence would lead a reasonable attorney to investigate further.’ ” 888 So.2d at 1230 (quoting Wiggins v. Smith, 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)).
Luong moved the trial court for funds for his counsel to travel to Vietnam to investigate his childhood and to interview various relatives, including his mother, stepfather, and aunts in an effort to develop mitigation evidence. In support of his motion, Luong attached an affidavit from a Dr. Paul Leung, a Vietnam native and a mitigation expert. Dr. Leung averred:
“I am of the opinion that Lam Luong’s childhood and adolescence in Vietnam is significant mitigation evidence. Vietnamese society is generally cruel in its treatment of Amerasian children, especially black Amerasians, and they are often ostracized and banished from society. Lam Luong is a black Amerasian and his personal history reveals he was treated much like other Amerasian children born before the fall of Saigon in 1975.”
The foregoing affidavit, however, does not adequately establish that the “known evidence” would lead a reasonable attorney to investigate further. The affidavit presents generalizations about the treatment of Amerasian children in Vietnam and does not provide any specific information about Luong’s childhood from which the trial court could determine that additional investigation in Vietnam would yield mitigation evidence. Therefore, the trial court did not exceed the scope of its discretion in denying Luong’s motion.
Moreover, the trial court did not deny Luong’s motion without providing an avenue for future relief. The trial court suggested that • Luong’s counsel conduct videoconferencing with Luong’s relatives in Vietnam to determine what, if. any, potential evidence the relatives could provide. The trial court further provided that, if the videoconferencing indicated that mitigation evidence could be developed in Vietnam, Luong could request funds for travel at a later date.
Because the record establishes that the trial court considered the reasonableness of Luong’s request and provided a means for Luong to develop mitigation evidence, the trial court-did not exceed the scope of its discretion in denying Luong’s request for funds for his counsel to travel to Vietnam to investigate mitigation evidence, and the judgment of the Court of Criminal Appeals holding, otherwise is reversed.
IV.
Last, the State contends that the Court of Criminal Appeals erred in determining that the trial court exceeded the scope of its discretion by admitting into *158 evidence at the sentencing hearing a videotape of Cpt. Darryl Wilson tossing sandbags of the approximate weight of each of the children off the Dauphin Island Bridge and his testimony about the rate of speed at which the children fell. The Court of Criminal Appeals held that
“because there was no testimony that showed that the experiment was similar to the actual events that occurred on the Dauphin Island Bridge, the admission of the evidence of Cpt. Wilson’s experiment was not relevant to or probative of the issue of Duong’s sentencing.”
Luong, 199 So.3d at 132. According to the State, the decision of the Court of Criminal Appeals conflicts with this Court’s decision in Ex parte Hinton, 548 So.2d 562 (Ala.1989), which recognizes that § 13A-5-45(d), Ala.Code 1975, provides for the admission of “[a]ny evidence which has probative value and is relevant to sentence.” The State maintains that the videotape and Cpt. Wilson’s testimony demonstrated how the offenses were committed and were probative and relevant to the jury’s determination whether the aggravating circumstance that “the capital offense was especially heinous, atrocious, or cruel as compared to other capital offenses,” see § 13A~5-49(8), Ala.Code 1975, was applicable.
This Court’s review of the record indicates that although Luong objected to the admissibility of the videotape and to Cpt. Wilson’s testimony before the sentencing hearing began, he did not object at the time the evidence was admitted. The law is well established that when a party is denied relief upon the filing of a motion in limine, the party must object with specificity at the time the evidence is proffered at trial to preserve the issue for appellate review. See Parks v. State, 587 So.2d 1012, 1015 (Ala.1991); and Huff v. State, 678 So.2d 293, 296-97 (Ala.Crim.App.1995). Because Luong did not object with specificity when the trial court admitted the videotape and testimony into evidence at the sentencing hearing, this issue is not preserved for appellate review. However, because Luong has been sentenced to death, his failure to object at trial does not bar appellate review; rather, this Court may conduct a review for plain error. See Rule 45A, Ala. R.App. P.[4]
In Ex parte Brown, 11 So.3d 933, 935-36 (Ala.2008), this Court explained:
“ ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is “particularly egregious” and if it “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” See Ex parte Price, 725 So.2d 1063 (Ala.1998).’ ”
(Quoting Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999).)
Additionally, this Court recognizes that this alleged error occurred during the sentencing hearing of Duong’s trial. Section 13A-5-45(d), Ala. Code 1975, provides that “[a]ny evidence which has probative value *159 and is relevant to sentence” is admissible during the sentencing phase of a capital trial. The Alabama Rules of Evidence do not apply at sentencing. Rule 1101(b)(3) of the Alabama Rules of Evidence provides:
“(b) Rules Inapplicable. These rules, other than those with respect to privileges, do not apply in the following situations:
[[Image here]]
“(3) Miscellaneous Proceedings. Proceedings for extradition or rendition; preliminary hearings in criminal cases; sentencing, or granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings with respect to release on bail or otherwise.”
(Emphasis added.) See also Whatley v. State, 146 So.3d 437 (Ala.Crim.App.2010)(holding that no rule of evidence barred the relevant testimony of the social worker at the penalty phase because “[t]he Rules of Evidence do not apply to sentencing hearings”). Furthermore, in Harris v. State, 352 So.2d 479 (Ala.1977), which predates the adoption of the Alabama Rules of Evidence, this Court stated:
“In the conduct of the sentencing hearing, the rules of evidence should be relaxed; and, while the criteria for aggravating circumstances are strictly construed against the State, proof of aggravating and mitigating circumstances may be by deposition, written interrogatories, affidavits or by reliable hearsay. While some discretion must of necessity be vested in the trial judge, unde latitude should be given the parties and their counsel in making opening statements, proffer of evidence, and in making closing arguments. Particularly, the convicted defendant should not be restricted unduly; for, literally, he is pleading for his life.”
352 So.2d at 495 (emphasis added).
In Duke v. State, 889 So.2d 1, 18 (Ala.Crim.App.2002) rev’d on other grounds, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005), the Court of Criminal Appeals held that the trial court did not exceed the scope of its discretion by admitting into evidence during the sentencing hearing of a capital trial a mannequin to demonstrate the way the victims were killed. Although this case involves a videotape demonstrating how the offenses were committed, we find the caselaw and reasoning in Duke instructive. Duke argued that the use of a mannequin, which was not comparable to the size and physical characteristics of the victims, constituted prejudice that was not outweighed by any probative value. In considering this issue, the Court of Criminal Appeals stated:
“A claim of this nature is relatively rare; however, this Court in Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999), rev’d on other grounds, 780 So.2d 796 (Ala.2000), addressed the use of a doll in a capital-murder prosecution to demonstrate how the victim’s injuries may have occurred. We stated:
“ ‘ “The rule on the admissibility of experiments in open court is stated in Shows v. Brunson, 229 Ala. 682, 682, 159 So. 248 (1935).
“‘“‘Experiments or tests of this character in open court are usually within the discretion of the trial judge, guided by a sound judgment as to whether the result will be sufficiently relevant and material to warrant such procedure. 22 C.J. p. 700, § 899.
“ ‘ “ ‘Similarity of conditions, and a test that will go to the substantial question in hand, should appear.’
*160 “‘“See also Hawkins v. State, 53 Ala.App. 89, 93, 297 So.2d 813 (1974). Both the scope and extent of the experiment, if allowed, rest within the sound discretion of the trial judge. The exercise of that discretion will not be reversed on appeal unless it has been clearly and grossly abused. Campbell v. State, 55 Ala. 80 (1876); C. Gamble, McElroy’s Alabama Evidence, § ,81.02(1) (3rd ed.1977).
“‘“While the conditions of the experiment and of the occurrence in issue should be substantially similar, they need not be identical. McElroy, 81.01(4).
“ ‘ “ ‘A reasonable or substantial similarity suffices and only where the conditions are dissimilar in an essential particular should the evidence of an experiment be rejected. If we have a case where the conditions are not identical, then the dissimilarity goes to the weight of the evidence of the experiment but not to its admissibility.’
““‘See also Eddy v. State, 352 So.2d 1161 (Ala.Cr.App.1977).”
“ ‘Ivey v. State, 369 So.2d 1276, 1278-79 (Ala.Cr.App.1979). See also, C. Gamble, McElroy’s Alabama Evidence, § 81.02 (5th ed.1996).
“‘However, before the demonstration, the trial court should determine if the prejudicial effect of the demonstration substantially outweighs its probative value. Even if the trial court finds the demonstration to be relevant and helpful to the jury, the trial court may still exclude it if the probative value is substantially outweighed by the danger of unfair prejudice. See Rule 403, Ala. R. Evid.; McElroy § 81.02. “The power to make this determination is vested in the trial court.” Hayes v. State, 717 So.2d [30,] 37 [ (Ala.Crim.App.1997) ].’
“780 So.2d at 762-63.”
889 So.2d at 18. Cf. Morgan v. State, 518 So.2d 186, 189 (Ala.Crim.App.1987) (holding that the trial court did not exceed the scope of its discretion in admitting into evidence during the guilt phase of a capital trial a videotaped reenactment of the offense).
The question presented by the admission of the videotape and Cpt. Wilson’s testimony is whether the evidence had probative value and was relevant to a jury determination and, if it was probative and relevant, whether the prejudicial effect of the evidence substantially outweighed its probative value.
The test for probativeness is whether an experiment or demonstration is “substantially” like the real event. I Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 81.001(2) (6th ed.2009). This Court has viewed the videotape, which shows the Dauphin Island Bridge and Cpt. Wilson dropping sandbags from the bridge, and has read Cpt. Wilson’s testimony. Cpt. Wilson testified that he “made the sandbags to the approximate weights ... of each child” and that he dropped the bags from the top of the bridge at that point where Luong had stated he had dropped the children. He also testified that the weather on the day he dropped the sandbags was similar to the weather on the day the offenses were committed. Luong did not cross-examine Cpt. Wilson about the videotape or about whether the conditions on the day it was made were similar to the conditions on the day of the offenses. The videotape was illustrative of the offenses and relevant to the determination whether the aggravating circumstance that the offenses were heinous, atrocious, or cruel applied to these murders. Considering the content of the *161 videotape and the “relaxed” evidentiary-standard during a sentencing hearing, the videotape had probative value and was relevant to the determination of an aggravating circumstance.
Moreover, this Court cannot agree with Luong that because the videotape had a “big visual impact” the risk of prejudice against him was extreme to the extent that it affected his substantial rights. Luong admitted that he threw his children off the Dauphin Island Bridge. The videotape demonstrated the acts Luong admitted he committed and did not create a danger unfair prejudice that substantially outweighed the probative value of the evidence. Cf. Duke, supra (holding that the prejudicial impact of a demonstration in open court during the penalty phase of how the children’s throats were slit did not outweigh the probative value of the demonstration). , This Court agrees with the trial court that the probative value of the evidence outweighed any danger of unfair prejudice.
This Court has also considered the questionable credibility and accuracy of Cpt. Wilson’s testimony that “objects fall at the same .rate of speed, regardless of the weight,” and that the children fell at a speed of 25 mph. Luong had an opportunity to challenge this testimony through cross-examination, and he chose not to do so. See Ballard v. State, 767 So.2d 1123, 1140 (Ala.Crim.App.1999) (“‘A party is given wide latitude on cross-examination to test a witness’s partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness’s testimony or recollection as well as the extent of his knowledge.’” (quoting Williams v. State, 710 So.2d 1276, 1327 (Ala.Crim.App.1996))). Therefore, in light of Luong’s acceptance of Cpt. Wilson’s testimony and the fact that the jurors "observed the rate at which the sandbags fell when they watched the videotape, this Court cannot conclude that the admission of the videotape “seriously affected his substantial rights” and “had an unfair prejudicial impact on the jury’s deliberations.” See Ex parte Brown, 11 So.3d 933, 938 (Ala.2008). See also Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden of establishing prejudice relating to an issue being reviewed for plain error).
Therefore, the judgment of the Court of Criminal Appeals holding that the trial court exceeded the scope'of its discretion in admitting the videotape and Cpt. Wilson’s testimony into evidence is reversed.

Conclusion

Based on the foregoing, the judgment of the Court of Criminal Appeals is reversed, and this case is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
MOORE, C.J., and BOLIN, SHAW, and BRYAN, JJ., concur.
PARKER, MURDOCK, and MAIN, JJ., dissent.
WISE,. J., recuses herself.*

. Luong killed his four children by throwing them off a bridge into the water 100 feet below the bridge.

. According to Luong, television coverage "continued to run” in the two months before the trial. The record, however, provides limited information about the content of the television coverage, and neither the transcripts nor the videotapes of the television coverage were presented to the trial court. Therefore, this Court cannot evaluate the prejudice, if any, the television coverage had upon the community.

. As previously noted, Mobile County has a population of over 400,000 citizens.

. Rule 45A, Ala. R.App. P., states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”